DENNIS MAYE, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—90—2259

Opinion filed December 27, 1991.

Rick Allan White, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Alison E. O'Hara, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Pope, Ballard, Shepard & Fowle, Ltd., of Chicago (Gloria M. Portela and Jeri A. Lindahl, of counsel), for respondent Allstate Insurance Company.

JUSTICE GREIMAN delivered the opinion of the court:

Appellant Dennis Maye appeals from an order of the Illinois Human Rights Commission (Commission) which dismissed his complaint against appellee Allstate Insurance Company (Allstate) because the Commission determined that his discharge by Allstate was not based on retaliation in violation of section 6—101(A) of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1989, ch. 68, par. 6—101(A)).

We reverse the decision of the Commission.

There is no dispute as to the underlying facts of this case. Maye was hired by Allstate as a unit supervisor trainee in November 1982, promoted to a unit supervisor in April 1983, and discharged in May 1986.

In January 1986 a division manager for Allstate, H.H. Metzinger, told Maye that he was not promotable above the position which he was currently holding, i.e., unit supervisor, but that he could remain with Allstate. Employees with less seniority than Maye had received supervisory promotions.

From Monday February 3, 1986, through Monday February 10, 1986, Maye was absent from work, claiming that he was on funeral leave out of State the entire time. Maye returned to work on Tuesday, February 11, 1986.

In fact, Maye was out of State attending his great aunt's funeral from Monday February 3 until Friday February 7 when he returned to Chicago. On February 7 Maye filed a race discrimination charge against Allstate for failing to promote him.

On Monday February 10, Maye called Deborah Felice, his supervisor at work, and explained that he had returned to Chicago but he had trouble with his brother's car coming back from the funeral and so would not be at work that day. Felice responded that Maye's absence for that day would not be excused for the funeral and he should be at work. According to Allstate's policy handbook, an employee is entitled to only one day to attend the funeral of a relative who is not in the employee's immediate family and the definition of immediate family did not include great aunts.

When Maye returned to work on Tuesday, February 11, Felice prepared a time card for Maye which reflected that Maye would receive funeral leave pay for February 3 through 7 but would not be

paid for his absence on February 10. Maye complained that he should be paid funeral leave for six days and that he would appeal Felice's decision to Jan Mack, Felice's supervisor. Mack advised Felice that management employees like Maye could not be docked for one day's pay. Accordingly, Mack had Felice prepare a time card for Maye to reflect that Maye was on funeral leave from February 3 through 7, 1986, and was not at work on February 10, 1986. Although dissatisfied with the result, Felice considered the issue of Maye's absence in February resolved on this day, February 11.

On April 15, 1986, Brian Fitzpatrick, the human resources department manager for Allstate, mailed a written response to the Illinois Department of Human Resources answering each allegation in Maye's discrimination charge which had been filed on February 7, 1986. Jean Eiden, a unit manager in the human resources department, helped Fitzpatrick prepare the response.

In the last week of April 1986, Felice distributed timekeeping audits to the supervisors under her supervision, including Maye. These audits listed the number of "occurrences" or absences attributed to the individual employee for a given period of time. An "occurrence" denoted an absence for a particular reason, whether lasting one day or continuous days. Under Allstate's policy, Maye was allowed six occurrences.

Within an hour of receiving his timekeeping audit, Maye told Felice that he was upset over the number of occurrences listed. The audit showed that Felice had listed Maye's absence for foot surgery as two occurrences. Maye contended that his absence for foot surgery in December 1985 and January 1986 was continuous and thus should count for only one occurrence.

On April 30, 1986, Maye requested and received a computer timekeeping record called a TK400 from a clerical employee in Allstate's human resource department. This computer record, which listed all Maye's absences, showed that his supervisor had listed Maye as having been absent for foot surgery from December 18, 1985, to January 4, 1986, and again from January 7 through January 10, 1986. However, Maye had actually been absent continuously from December 18, 1985, to January 10, 1986, due to foot surgery.

On May 5, 1986, Maye submitted to Felice a note from his doctor dated December 1985 which maintained that Maye was continuously absent from December 1985 to January 1986. Felice refused to change Maye's record to reflect one occurrence.

Later that same day, May 5, Maye requested his personnel file from Eiden in the human resources department because he wished to

determine if his file contained a document he had previously given to Mack, and expressed his concern about the number of occurrences listed for him. Eiden informed Maye that his personnel file had been checked out and thus was not available. Maye did not request a time-keeping record (TK400) since he already had obtained a copy from a clerical employee on April 30.

Eiden was aware of Maye's discrimination charge having gathered documents for Allstate's response to his charge and having worked with Fitzpatrick on the response. When Maye left the human resources department, Eiden advised Fitzpatrick that Maye requested to see his personnel file because he was concerned about the number of occurrences. Fitzpatrick had Maye's personnel file since he had required it to respond to Maye's discrimination charge. Fitzpatrick had retained Maye's personnel file although he had answered the discrimination complaint three weeks earlier and his normal practice was to return such files after his response had been filed. Fitzpatrick then asked Eiden to run an attendance printout, *i.e.*, a TK400, on Maye.

On May 6, 1986, Fitzpatrick received and reviewed the attendance printout for Maye. By examining Maye's attendance printout, Fitzpatrick circumvented normal procedures at Allstate because it was neither his nor Eiden's function to resolve disputes about occurrences or absences. Instead, the unit manager was expected to resolve such problems with a supervisor such as Maye.

As he examined the printout, Fitzpatrick was aware Maye's dispute concerned his absence for a foot injury around December 1985. Nevertheless, after his examination of the listed occurrences, Fitzpatrick noticed the February dates marked for paid funeral leave at the bottom of the document even though paid funeral days do not constitute an occurrence and were not then the subject of any dispute. Fitzpatrick removed Maye's discrimination complaint from his desk drawer, observed that Maye's charge had been filed on February 7, and also noted that Maye's printout revealed that Maye was paid by Allstate for funeral leave on February 7.

On that same day, May 6, Fitzpatrick informed his immediate supervisor, Cathy Brune, of the apparent discrepancy in Maye's whereabouts on February 7. Brune directed Fitzpatrick to find out what happened on February 7. Fitzpatrick then told Jim Douglas, who supervised Felice, about the February 7 discrepancy. In turn, Douglas asked Felice to prepare a memorandum detailing what had occurred during Maye's funeral leave and Felice did so.

On May 7, 1986, Fitzpatrick met with Maye and told Maye that his days of absence due to foot surgery would be treated as one occur-

rence. Then Fitzpatrick asked Maye to reconstruct the events of his funeral leave in February. Maye told Fitzpatrick that he was in Alabama on February 7, did not leave for Chicago until Sunday February 9, and had car trouble on the trip so could not return to work on Monday February 10. Immediately following this meeting, Maye met with Douglas and reiterated the same explanation to Douglas. Later on May 7, a third meeting was held with Fitzpatrick, Douglas and Maye. Fitzpatrick and Douglas presented Maye with a copy of the discrimination charge dated February 7 and asked Maye to explain how he could be both in Chicago and out of State on the same day. Maye was advised to obtain some documentation of his whereabouts on February 7.

The next day, May 8, 1986, Maye again met with Fitzpatrick and Douglas and gave them a copy of his great aunt's funeral notice dated Tuesday February 4, 1986. However, Maye did not explain how he could be in two places at the same time on February 7.

Effective May 26, 1986, Allstate discharged Maye on the grounds that it lost confidence in Maye's ability to be an effective supervisor. Allstate's policy manual specifies that loss of confidence is a reason for immediate discharge.

Following his termination, Maye filed a complaint alleging that Allstate terminated his employment in retaliation for his having filed a race discrimination charge against Allstate, a violation of section 6—101(A) of the Act.

The administrative law judge (ALJ), in her "Conclusions of Law," found that Allstate had violated section 6—101(A). The ALJ reasoned that the investigation of Maye's attendance record by Allstate's human resources department in May 1986 was initiated because Maye had filed a discrimination charge three months earlier in February 1986. Regarding a remedy, the ALJ found that Maye was entitled to monetary relief but not reinstatement in his former job because he had made misrepresentations as to his whereabouts on February 7 and 10, 1986.

The Commission adopted the factual findings of the ALJ but dismissed Maye's complaint "on the grounds that he failed to show that his discharge by Allstate Insurance Company was based on retaliation in violation of Section 6—101(A) of the Human Rights Act." The Commission reasoned that Allstate did not commit an adverse act against Maye.

Furthermore, the Commission, in its decision, agreed with Maye that the focus in this case is the process which led to his termination and not the termination itself. (*Crawford v. Roadway Express, Inc.*

(W.D. La. 1980), 485 F. Supp. 914 (a campaign of harassment undertaken with retaliatory motives constitutes "retaliation" within the Act).) However, the Commission found that "it is the fact that Mr. Fitspatrick [*sic*] looked at the bottom of the sheet of paper [Maye's attendance printout] which is the alleged act of discrimination." The Commission concluded that Fitzpatrick's "glance at the bottom of the printout" did not constitute an "adverse act" and thus a finding of retaliation was not warranted.

Maye now appeals from the Commission's decision and contends that: (1) he sufficiently established his claim of retaliatory discharge; and (2) the Commission exceeded its authority by implicitly overturning the ALJ's findings of fact. Additionally, Maye requests reinstatement to his former position.

Maye argues that Fitzpatrick reviewed Maye's attendance printout in retaliation for his filing of a discrimination charge. Fitzpatrick's allegedly illegal review led to the discovery of the discrepancy in Maye's funeral leave dates. Then, Allstate's representatives held Maye responsible for his misrepresentation of his absence from work which was ultimately the cause of his discharge. The key, according to Maye, is that the chain of events which resulted in his termination began with Fitzpatrick's illegally motivated investigation of Maye's file.

In their responses, the Commission and Allstate assert that Fitzpatrick's review of Maye's attendance printout was initiated by Maye himself when he made inquiries about the number of occurrences constituting his absences from work and Allstate's inadvertent discovery of Maye's deception regarding funeral leave did not establish a *prima facie* case of retaliation under the Act. In addition, the Commission and Allstate contend that the reason articulated for firing Maye, *i.e.*, loss of confidence in Maye's ability to be an effective supervisor, was a legitimate business reason, not a pretext for discrimination.

The scope of our review of the Commission's decision is limited by section 8—111(A)(2) of the Act, which mandates that "[i]n any proceeding brought for judicial review, the Commission's findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." (Ill. Rev. Stat. 1989, ch. 68, par. 8—111(A)(2).) Accordingly, the function of the reviewing court is restricted to ascertaining whether the final decision of the Commission is against the manifest weight of the evidence. *Shah v. Human Rights Comm'n* (1989), 192 Ill. App. 3d 263, 272, 548 N.E.2d 695; *Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 180, 496 N.E.2d 1138.

■ The dispute in the present case focuses on whether the facts establish a violation of section 6—101(A) of the Act, which provides in relevant part as follows:

"It is a civil rights violation for a person, or for two or more persons to conspire, to:

*** [r]etaliate against a person *** because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act." Ill. Rev. Stat. 1989, ch. 68, par. 6—101(A).

In analyzing employment discrimination actions brought under the Act, the Illinois Supreme Court adopted the same three-part test enunciated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. *Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 545 N.E.2d 684.

The three-step analysis as stated in *Zaderaka* provides:

"[1] First, plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a rebuttable presumption arises that the employer unlawfully discriminated against plaintiff. [2] Second, to rebut the presumption, the employer must articulate, not prove [citation], a legitimate, nondiscriminatory reason for its decision.

■ Finally, if the employer carries its burden of production, the presumption of unlawful discrimination falls and plaintiff must then prove by a preponderance of the evidence that the employer's articulated reason was not its true reason, but instead a pretext for unlawful discrimination. This merges with plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against plaintiff. [Citation.] This ultimate burden remains at all times with plaintiff." *Zaderaka*, 131 Ill. 2d at 178-79, 545 N.E.2d 684.

■ To establish a *prima facie* case of retaliation under the Act, as required in the first step of the *Zaderaka* test, a plaintiff employee must show that: (1) he engaged in a protected activity; (2) the employer committed an adverse act against him; and (3) a causal nexus existed between the protected activity and the adverse act. *Burton & Illinois Bell Telephone Co.* (1985), 17 Ill. HRC Rep. 21, 29.

■ In the present case, the first prong of establishing a *prima facie* case is satisfied because filing a race discrimination charge, as Maye did, is indisputably a protected activity.

According to the Commission's decision, Maye failed to satisfy the second prong of establishing a *prima facie* case, *i.e.*, an adverse act committed by Allstate. The Commission specifically stated as follows:

"In order to prove a case of retaliation the complainant must prove that after he engaged in protected activity, an 'adverse act' was taken against him. [Citation.] It cannot be said that Mr. Fitspatrick's [*sic*] glance at the bottom of the printout was an 'adverse act' within the meaning of our precedent. The glance did not inflict injury, and it was not the proximate cause of injury. The proximate cause of Maye's termination was his own misrepresentation."

We believe that the manifest weight of the evidence does not support the Commission's decision that the action taken by Fitzpatrick did not constitute retaliation within the meaning of the Act.

The facts reveal that Fitzpatrick reviewed Maye's attendance records only because Maye had filed a discrimination charge. First, the job duties of Fitzpatrick as the human resources department manager did not include resolving controversies over the number of occurrences listed for a unit supervisor such as Maye. Thus Fitzpatrick went outside the established chain of command to address a dispute concerning an employee who had filed a discrimination charge.

Second, on May 5, 1986, Maye only requested his personnel file from Eiden, whose job it was to make personnel records available. Maye neither requested an attendance printout since he already had it nor any intervention in his dispute over the number of occurrences listed on the printout. Maye's sole purpose in going to the human resources department was to obtain his personnel file to see if it contained a letter from his doctor about his absence from work for foot surgery.

Third, in May 1986, Maye was only concerned with the number of occurrences attributed to him due to his absence for foot surgery in December of 1985 and January of 1986. Not only was the issue of Maye's absence from work for funeral leave already resolved when he returned to work on February 11, 1986, but also funeral leave was not considered an occurrence by Allstate.

Fourth, instead of returning Maye's personnel file when Eiden informed him of Maye's request, Fitzpatrick kept the file and had Eiden generate Maye's attendance printout. Fitzpatrick had already responded to Maye's discrimination charge three weeks earlier and under normal business practice would have returned the file to its regular location.

Fifth, the scope of Fitzpatrick's review of Maye's attendance printout exceeded the types of absences characterized as occurrences. Fitzpatrick examined the days listed for Maye's absence due to foot surgery, other absences defined as occurrences, and funeral leave days which are not considered occurrences.

Sixth, Fitzpatrick misrepresented the origin of his investigation to his superiors by stating that Maye had requested a review of his attendance records to consider two occurrences, absence for foot surgery and funeral leave. Maye had not made any inquiry of Eiden, let alone Fitzpatrick, concerning his absences.

■ Moreover, Fitzpatrick's review of Maye's attendance record occurred only three months after Maye filed a discrimination charge. A *prima facie* case of retaliatory discharge can be established by showing a short span between the time a competent employee filed a discrimination charge and the time of the employer's adverse action. (*State v. Human Rights Comm'n* (1989), 178 Ill. App. 3d 1033, 534 N.E.2d 161 (16 days after the employee filed a discrimination charge she was forced to take administrative leave and was ultimately discharged); *Heeren Co. v. Human Rights Comm'n* (1986), 150 Ill. App. 3d 234, 502 N.E.2d 17 (one week after the employer received notice of the discrimination charge, the complaining employee was fired); *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639 (only 37 days elapsed between the filed charge and the employer's decision to fire the complaining employee); *Alexander v. Illinois Fair Employment Practices Comm'n* (1980), 83 Ill. App. 3d 388, 403 N.E.2d 1271 (less than two months passed between the filing of a complaint and the employee's termination); *Washington & Groen Division/Dover Co.* (1985), 19 Ill. HRC Rep. 106, 119 (a 4½ month period was deemed sufficient to establish a causal connection).) Thus, in the present case, the three-month time period between the filing of Maye's discrimination charge and Fitzpatrick's review of Maye's attendance record is sufficiently suspect to establish a *prima facie* case of retaliatory discrimination when reviewed in the context of all the facts of this case.

Absent the adverse act of Fitzpatrick's initiation of an investigation into Maye's attendance record, the issue of Maye's whereabouts on February 7 would never have been raised. Indisputably, his absence in February was the cause of his discharge. Accordingly, Maye established a *prima facie* case of retaliation under the *Zaderaka* test.

■ Once a *prima facie* case of retaliation has been established, the employer must articulate a legitimate, nondiscriminatory reason for its decision to discharge the employee. (*Zaderaka*, 131 Ill. 2d at

178-79.) Allstate maintains that it discharged Maye because it had lost confidence in Maye's ability to be a supervisor since Maye misrepresented or was unable to explain his whereabouts on February 7 and 10. Allstate's reason does not rebut Maye's case because it does not address the adverse act, *i.e.*, Fitzpatrick's initiation of an investigation into Maye's attendance record prompted by Maye's filing of a discrimination charge.

■ To allow an unlawful initiation of an investigation to justify the use of negative information obtained from the investigation virtually invalidates the statutory prohibition against retaliation. The protections afforded by the Human Rights Act cannot be compromised. To condone discrimination clearly contravenes the public policy expressly declared in the Act. (Ill. Rev. Stat. 1989, ch. 68, par. 1—102.) The mission of the Act is to prevent and eliminate discriminatory practices. The Act specifically declares that it is the State's public policy to secure freedom from discrimination for all individuals. (Ill. Rev. Stat. 1989, ch. 68, par. 1—102(A).) Retaliatory discharges discourage employees from asserting their rights under the Act. Such action by an employer has a chilling effect on the stated goals and policies of the Act.

■ After a careful examination of the facts in this case, we find that the Commission's decision was against the manifest weight of the evidence. In light of our decision, we need not reach the second issue raised by Maye as to whether or not the Commission's decision improperly invaded the province of the ALJ.

Accordingly, we reverse the order of the Commission and remand for further proceedings consistent with our opinion.

Reversed and remanded.

CERDA, P.J., and RIZZI, J., concur.