Franklin CROSS, Plaintiff,

v.

**RYDER INTEGRATED LOGISTICS,** Defendant.

No. 97 C 6288.

United States District Court, N.D. Illinois, Eastern Division.

March 21, 2001.

---

---

Robert A. Wolf, Wolf & Norris, Oak Park, IL, for Plaintiff.

Michael G. Cleveland, Eileen B. Berner, Vedder, Price, Kaufman & Hamholz, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Franklin Cross ("Cross") has filed a three-count Complaint against his former employer Ryder Integrated Logistics ("Ryder"), claiming that Ryder terminated him unlawfully from his truck driver job with the company. Cross alleges that Ryder terminated him (1) because he was disabled in violation of the Americans with Disabilities Act ("ADA," 42 U.S.C. §§ 12101–12117), (2) because of his race in violation of Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e to 2000e–17)[1] and (3) in retaliation for having filed a workers' compensation claim in violation of Illinois law (820 ILCS 305/4(h)). Ryder has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56, and both sides have complied with this District Court's LR 56.1.[2] For the reasons stated in this memorandum opinion and order, Ryder's motion is granted and this action is dismissed in its entirety.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Ryder the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). As *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999) has more recently quoted from *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

While that general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue (*Miller v. Borden*, 168 F.3d 308, 312 (7th Cir.1999)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies

---

1. Citations to both of those federal statutes will take the form "Section—," omitting references to Title 42.

2. LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Ryder's LR 56.1(a)(3) statement as "R. St. ¶—" and to Cross' LR 56.1(b)(3)(B) statement of additional facts as "C. St. ¶—." Responses to those statements are respectively cited "R. Resp. ¶—" and "C. Resp. ¶—." This opinion also employs the same "C." and "R." abbreviations when referring to the parties' exhibits.

the Rule 56 standards (*id.*). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could find in favor of Cross (see *Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there).

### Facts

Ryder provides outsourced distribution functions for companies (R. St.¶ 5). Cross, an African–American male, began his truck driver employment with Ryder on June 11, 1995 (R. St.¶¶ 4, 6),[3] with Ryder Operations Manager Joe Lassa ("Lassa," who is white) having actively recruited him from a company that contracted to provide drivers to Ryder—indeed, Ryder had to pay that company a $1,500 fee to hire Cross away to handle the same account that he had serviced as a contract driver (R. St.¶¶ 8–11). On September 1, while on duty unloading a truck in Kansas City, Missouri, Cross felt a snap in his back and neck (R. St.¶ 13). Although Cross was able to complete his run, he continued to experience back and neck pain when he returned to Aurora, Illinois (R. St.¶¶ 14, 15). Cross sought and received treatment at the emergency room of Trinity Hospital, where he was given medication and a referral to several physicians for possible followup (R. St.¶ 15).

Cross visited several doctors regarding his injury. First he was examined by Dr. James Schiappa on September 5 (R. St. ¶ 16). On the basis of that evaluation, Dr. Schiappa kept Cross off of work for two weeks (*id.*). Dr. Schiappa evaluated Cross again on September 14, and on that occasion he determined that Cross should not work again until October 5 (R. St.¶ 18). Meanwhile, on September 12 Cross had filed a workers' compensation claim with the Illinois Industrial Commission (R. St. ¶ 17).

Ryder referred Cross to its own doctor, Dr. Avi Bernstein, for an independent medical examination on September 29 (R. St.¶ 19).[4] In his assessment of Cross following that visit, Dr. Bernstein wrote that while Cross appeared to have suffered a cervical and lumbar strain as the result of a work-related accident, "there is evidence of severe symptom magnification and exaggeration of his physical examination" and that Cross "appeared to have excessive diffuse symptomatic complaints" (R. St.¶ 20). Dr. Bernstein recommended treatment with medications and physical therapy program for a period of three to four weeks, after which he expected Cross to be able to return to work (*id.*).

On October 3 Dr. Schiappa released Cross to return to work with restrictions barring his lifting or pushing over 30 pounds and requiring him to avoid bending and squatting. Dr. Schiappa specified that Cross was unable to drive a truck (R. St.¶ 21). That meant that if Cross were

**3.** Because most of the ensuing operative events also occurred during 1995, any dates referred to hereafter without any year designation are also 1995 dates.

**4.** Cross denies Ryder's factual assertions in R. St. ¶¶ 19 and 20 as "based upon an improper, hearsay document from Dr. Bernstein..." (C. Resp.¶¶ 19, 20). Both paragraphs cite to an unsigned copy of a letter that Dr. Bernstein originally sent to Ryder employee Denise Pretzer ("Pretzer"). Because Ryder had apparently not retained the original of that letter, it subpoenaed Dr. Bernstein to obtain a copy, which it has included as one of the documents in R. Ex. Tab F. Even apart from the fact that any dispute as to Dr. Bernstein's statements is unimportant because those facts are ultimately not material to the outcome of this case (which is also true of Dr. Bernstein's statements referred to in R. St. ¶¶ 34 and 35 as well), Cross' counsel is wrong in objecting on hearsay grounds. Dr. Bernstein's evaluations are admissible for the fact that they were made and that Ryder could justifiably rely on them, not for their truth as such—and that renders them nonhearsay.

then to perform any work for Ryder, Ryder would have to accommodate him by finding an alternative position for him.

Ryder has a policy as to the accommodation of injuries: When an employee is unable to perform his job due to injury, Ryder will return him to work if there is a position available that is within the employee's skills and abilities to perform and that is consistent with his medical limitations (R. St. ¶ 22). Upon learning that Cross had been released to return to work with limitations, Lassa spoke to Rob Kalinoski ("Kalinoski," Ryder's Driver Recruiting Center Manager for its Driver Recruiting Center in Bridgeview, Illinois) to ask whether there were any positions available that Cross could perform subject to his limitations (R. St. ¶ 23).

As Driver Recruiting Center Manager, Kalinoski (who is also white) was responsible for filling all driver, warehouse and warehouse clerical positions in the Chicago area (R. St. ¶ 24). Due to a backlog of work at the Recruiting Center, Kalinoski needed someone to assist at the Center in making phone calls and doing filing, and he told Lassa that he could use Cross as long as there was a need for such services (R. St. ¶ 25). On October 13 Lassa wrote Cross a letter directing him to return to work on October 18 in a light duty job as Transportation Clerk at the Recruiting Center (R. St. ¶ 26).

On October 18 Cross returned to work in compliance with that direction (R. St. ¶ 27). Toward the end of that day, which he had spent making phone calls and doing filing, Cross claimed to have reinjured his back and was taken to the emergency room at Christ Hospital (R. St. ¶¶ 28–29). Dr. Schiappa examined Cross the next day and kept him off of work until October 23

(R. St. ¶ 30). Dr. Schiappa also referred Cross to Dr. Mark Cohen for pain treatment (id.).

In an October 24 letter Lassa wrote Cross that Dr. Schiappa had cleared him to return to work and that the Transportation Clerk position remained available to him (R. St. ¶ 31). Although some factual disputes exist as to the ensuing sequence of events, it appears that Lassa had a phone conversation with Cross about that letter in which Cross said that he was going to be examined by Dr. Cohen (R. St. ¶ 32, Cross Dep. 76–77). It further appears that Dr. Cohen kept Cross off of work based on that examination (R. St. ¶ 33).[5]

On November 6 Dr. Bernstein examined Cross for a second time (R. St. ¶ 34). In a same-day letter to Pretzer, Dr. Bernstein said that Cross' "physical examination reveals an almost hysterical display of discomfort" and that Cross exhibited abnormal and contradictory responses (R. St. ¶ 35). Dr. Bernstein concluded that Cross' "objective findings do not support his subjective complaints" and recommended that Cross be returned to work (id.).

Cross did not return to work, though. Cross visited a number of other physicians of his own choosing, all of whom, including Dr. Jagan Mohan, kept him off work (R. St. ¶ 36). Plainly, then, there was a difference of opinion as to the severity of Cross' condition among the doctors who examined him, but a difference that is ultimately of no significance to the outcome of this case.

Cross had been out of work for almost a year when on September 24, 1996 Dr. Mohan released him to return to work beginning two weeks later, with the restriction that he was not to lift more than five to ten

5. Although Ryder cites Cross Dep. 73–74 in support of R. St. ¶ 33, it has not submitted page 73 despite Cross' objection to that failure. As it happens, though, the fact is not material—and in any event it is undisputed that Cross did not return to work for Ryder in any capacity after his October 18 injury.

pounds (R. St.¶ 38). Cross faxed Dr. Mohan's note to Lassa, who told Cross he was going to talk with Kalinoski to try to find a position for Cross (R. St.¶¶ 39–40).

Lassa then asked Kalinoski whether there were any positions that fit within Cross' restrictions (R. St.¶ 41). After Kalinoski reviewed the available positions, he determined that none of them met Cross' restrictions (R. St.¶¶ 42–43) and told that to Lassa (R. St.¶ 44).

Then later that month (October 1996) Lassa got in touch with a member of Ryder's Human Resources Department, Robin Shaw ("Shaw"), to inquire about the appropriate action in Cross' case (R. St. ¶ 47). After Lassa spoke with Shaw on several occasions, and after some involvement by Ryder's legal staff (R. St.¶¶ 48–49), Lassa sent a standard form letter to Cross on October 22 that stated in pertinent part (R. St.¶ 50):

> Ryder's payroll records reflect that you have not been on active status since October 19, 1995. It is Ryder's policy to review the status of inactive employees after one year and, where warranted, administratively separate them from employment.
>
> It is Ryder's understanding that you are unable to perform the essential functions of your job, with or without reasonable accommodation. If this information is incorrect, please advise us no later than October 31, 1996. if [sic] we do not hear from you by this date, your employment will be administratively terminated at that time.

6. Although there is some dispute about that conversation, Cross' version of events is of course credited for purposes of the present motion.

7. For example, Lassa's testimony indicates that he understood the policy in these terms (R. Ex. Tab D at 46):

According to Cross, after he received the letter he called Lassa and told him, "I can still do my job" (Cross Dep. 100).[6] Cross further testified that in response to that call Lassa reminded him that the letter had required Cross to provide additional medical information, which he had not done (id. 100–01). Cross' efforts to persuade Lassa to allow him to keep his job were unsuccessful, and Cross' termination became effective on October 31 (R. St.¶ 52).

At several points throughout Ryder's memoranda (see, e.g., R. Mem.11) it claims that it fired Cross because of its "12 month policy": a written policy that calls for the dismissal of any Ryder employee who has been absent from work for over a year because of a work-related injury. Ryder has characterized the 12 month policy as mandatory, one that is applied without discretion.

But Cross disputes that, pointing to the policy's terms (R. Ex. Tab E):

> Ryder policy allows an employee to be terminated if disability exceeds 12 months. If the location is contemplating terminating an employee collecting Workers' Compensation "lost time" benefits, prior to taking any action, the Supervisor must coordinate the termination with the appropriate human resources representative and the RSC Regional Claims Office.

It is true that the policy uses "allows" rather than a term such as "requires," and other record evidence tends to confirm the idea of its discretionary application.[7] But

> It is our policy to separate ourselves from employees who have not worked for us for a year without any—for no reason. . . .

More probative is this statement in Lassa's own October 22, 1996 letter to Cross (R. St.¶ 50)(emphasis added):

> It is Ryder's policy to review the status of inactive employees after one year and, *where warranted,* administratively separate them from employment.

nothing in that difference impugns the honesty of Lassa's application of that policy to Cross in light of all the circumstances recounted to this point.[8] Hence as discussed below, any factual dispute in that respect is of no significance to the disposition of this case.

Despite losing his job with Ryder, Cross did not remain unemployed very long. In fact, even before the effective date of his termination Cross held truck driver positions with Ed Rochaz delivery and Viking Freight (R. St.¶¶ 53, 55). All told, from October 1996 to the day of his deposition (on December 2, 1998) Cross held full-time truck driver jobs with no fewer than eight different companies (R. St.¶¶ 53–71). In connection with at least two of those jobs, including Viking Freight, Cross told the employer that he had no history of back or spinal injuries (R. St.¶¶ 56, 60).

### ADA Claim

■ By definition the ADA prohibits disability-based employer discrimination (*Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 683 (7th Cir.2000), citing Section 12112(a)). But for Cross to establish a prima facie case under that statute, he must of course show[9] that his condition indeed qualifies as a "disability" (*id.*), citing *Feldman v. American Mem'l Life Ins. Co.*, 196 F.3d 783, 789 (7th Cir.

1999)). Because the undisputed evidence negates that, Cross' ADA claim must be dismissed.

Section 12102(2) defines a disability in these terms:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such an impairment.

Cross' inability to qualify under alternative (A) will bar his recovery in those terms even if Ryder had terminated him expressly because of his condition (*Sinkler*, 209 F.3d at 683, citing *Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir.1998)). And if Cross' condition does not amount to the type of impairment described in Section 12102(2)(A), he cannot claim under alternative (B) either (*id.*), citing *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 n. 7 (7th Cir.1998)).

Although Cross has not really articulated his ADA-based theory, what *is* plain is that he does not even arguably fit the third quoted alternative.[10] And as already noted, Cross will be able to succeed under alternative (B) only if he is able to identify an impairment that qualifies under (A). Thus the viability of Cross' ADA claim

---

8. It should be noted in that respect, because Lassa was the decisionmaker in Cross' termination, that Lassa was admittedly unaware of the 12–month policy before he learned of it from Shaw (C. Resp.¶ 48) and that he acted in accordance with her input and that of Ryder's legal department in implementing it. That alone essentially torpedoes Cross' claims of race-based discrimination and a retaliatory firing. And as for the latter, this opinion later identifies the illogic of ascribing termination to Cross' filing of his workers' compensation claim.

9. At this summary judgment stage, of course, Cross need not "show" or "establish" or

"prove" anything. Instead he must merely demonstrate the existence of a genuine issue of material (that is, outcome-determinative) fact to defeat Ryder's summary judgment motion. Although this opinion will nonetheless often employ one of those quoted terms because that terminology is used by the cited cases, this Court has consistently imposed that lesser burden on Cross in testing his claims.

10. Examination of both Cross' Complaint and his responsive memorandum reveals no argument to the effect that he was "regarded as" having a disability.

centers upon whether there is a genuine issue of material fact as to whether he suffers an impairment that substantially limits one or more major life activities.

■ In those terms Cross has clearly self-destructed, for the only major life activity that he has identified as purportedly limited by his condition is that of working. On that score it is conventional wisdom "that 'an inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work; rather, 'the impairment must substantially limit employment generally'" (*Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 725 (7th Cir.1998), quoting *Byrne v. Board of Educ., Sch. of W. Allis–W. Milwaukee*, 979 F.2d 560, 565 (7th Cir.1992)).

Here the undisputed evidence establishes that Cross' impairment did not limit his employment at all (let alone "generally") when he was terminated. Even before his termination from Ryder took effect, Cross began working as a truck driver for other companies. As stated at the end of the *Facts* section, he held no fewer than eight such jobs during the immediate post-termination two year period (a far more extreme scenario than that found fatal in *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 953 (7th Cir. 2000)). Under those circumstances it is frankly an affront—really frivolous—for Cross to argue that his ability to drive trucks was significantly limited by his condition. Indeed, that is really exacerbated by statements made by Cross himself:

1. For one thing, he admits that he told Lassa "I can do my job" in October 1996 (R. Ex. B at 100).

2. For another, he told two of the other truck companies that he had no history of back or spinal injuries.

It is really an understatement to label Cross' ADA claim as wholly wanting in merit. It is dismissed.

### Title VII Claim

Cross' Title VII claim charges Ryder with disparate treatment racial discrimination when it fired him. At this summary judgment stage Cross may show discrimination either directly (which may be done by direct or circumstantial evidence or both) or via the indirect *McDonnell Douglas* burden shifting method (*Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir.1999)).

■ In this instance, lacking any direct evidence of racial discrimination, Cross must perforce look to the second (indirect) method. Although Ryder has correctly pointed out the highly problematic nature (really an understatement) of Cross' effort to create a genuine issue of material fact on the fourth element of the necessary prima facie case—which is only volley one in the *McDonnell Douglas* ping pong match [11]—Cross' Title VII claim flounders for a far more basic reason.

In defining the plaintiff's burden in any employment discrimination trial, our Court of Appeals has framed the issue straightforwardly in *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir.1996)(per curiam):

> The central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national ori-

---

11. That fourth element is a showing that others not in Cross' protected class received more favorable treatment. See, e.g., *Simpson v. Borg–Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir.1999), citing *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. 1998).

gin, etc.) and everything else had remained the same.

That reflects the simple tautology (a tautology as true at the Rule 56 stage as at trial) that anyone who claims to have suffered disparate treatment as an African–American (as Cross does here) must demonstrate—or in Rule 56 terms must create a legitimate factual issue as to whether—the employer took the adverse employment action *because* the employee was African American.[12]

In those terms Cross' Title VII claim is just as empty as his ADA claim has proved to be. It is not enough for Cross to say "Aha! Both Lassa and Kalinoski are white, and I am black. QED." After all, Lassa reached out to hire Cross as a driver to begin with, actually paying a $1,500 premium to bring him aboard. When Cross sustained his injury after just a few months' employment, Lassa reached out again to seek an alternative job that Cross could then handle, and at Lassa's request Kalinoski located a light duty job to which Cross was promptly assigned. And when it became clear that Cross would not be returning to his truck driving job, Lassa hired another African American driver to replace him (Lassa Aff. ¶ 8).

In short, there is not a whisper in the record to support even a suspicion that racial animus was at work in the treatment that Cross received from Ryder. There is frankly no way in which Cross can have pursued his race discrimination claim in the objective good faith demanded of every litigant by Rule 11. In fact, given the record here, even the required level of subjective good faith on Cross' part must be suspect as well. This Title VII claim too is rejected.[13]

### Retaliatory Discharge Claim

■ That leaves only Cross' Illinois state law claim for retaliatory discharge, advanced before this Court pursuant to 28 U.S.C. § 1367(a). Most frequently a federal court will relinquish jurisdiction over such a supplemental state law claim when the federal claims are dismissed before trial (*Rothman v. Emory Univ.*, 123 F.3d 446, 454 (7th Cir.1997) and cases cited there). But courts are not required to do so (*id.*), citing cases). There are some cases "in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point to federal decision of the state-law claims on the merits" (*id.*), quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994)).

This case presents just such an exception. No useful purpose would be served by eschewing jurisdiction over the remaining claim, given (1) that its underlying factual basis is virtually identical to the underpinning of Cross' federal claims and

---

12. From another perspective, this is really no different from saying that the employer's stated reason for its action is nonpretextual even after any reasonable adverse inferences are drawn—the last step in the *McDonnell Douglas* formulation, without any need to go through its mechanistic first steps (see, e.g., such cases as *Roberts v. Separators, Inc.*, 172 F.3d 448, 451 (7th Cir.1999)).

13. Cross Mem. 6 argues that he "requested racial identification from [Ryder] during the course of discovery...but [Ryder] has yet to supply this information." It should first be said that this Court has been more than generous in allowing time to conduct discovery. Discovery was originally ordered closed well over two years ago (on November 9, 1998), and this Court granted several extensions of the discovery cut-off thereafter. Finally, on January 11, 2001 this Court rejected Cross' motion to extend discovery (yet again). But even apart from Cross' more than ample opportunity to conduct discovery on that and every other issue, no predicate whatever exists for any adverse inference that some concealed racial bias is lurking in the background.

(2) that the state law claim can be readily resolved as well. Moreover, the total poverty of Cross' already-dismissed claims leaves this Court reluctant to subject Ryder to the burden of possibly having to defend a totally new lawsuit in a state court if this Court were to enter a purely procedural dismissal of the state law claim.

As for the merits of that third claim, Cross contends that he was fired in retaliation for filing a workers' compensation claim with the Illinois Industrial Commission. Here is the definitive statement of the standards governing that tort, as set out in *Clemons v. Mechanical Devices Co.*, 184 Ill.2d 328, 335, 235 Ill.Dec. 54, 704 N.E.2d 403, 406 (1998)(internal citations omitted):

> To recover damages for the tort of retaliatory discharge predicated upon the filing of a workers' compensation claim, an employee must prove: (1) that he was an employee before the injury; (2) that he exercised a right granted by the Workers' Compensation Act; and (3) that he was discharged and that the discharge was causally related to his filing a claim under the Workers' Compensation Act. Moreover, if an employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and the trier of fact believes it, the causation element required to be proven is not met. Concerning the element of causation, the ultimate issue to be decided is the employer's motive in discharging the employee.

> In retaliatory discharge cases, an employer is not required to come forward with an explanation for an employee's discharge, and it remains plaintiff's burden to prove the elements of the cause of action. An employer may choose to offer a defense if it desires, however.[14]

In a federal forum that framework is modified to some extent to parallel the Title VII model, allowing proof of retaliation either (1) directly (through direct or circumstantial evidence) or (2) indirectly under an equivalent to the *McDonnell Douglas* burden shifting approach (see *Bourbon v. Kmart Corp.*, 223 F.3d 469, 473 (7th Cir.2000), citing *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 767 (7th Cir.1994)).

In this instance Cross does not even attempt to travel the *McDonnell Douglas*-type path. And as for the first possibility (that calling for direct proof), Cross has proffered no evidence that even inferentially supports the existence of a genuine issue of material fact as to any causal link between the filing of his workers' compensation claim and his termination.

Before this opinion turns to the asserted evidentiary predicate for Cross' final claim, it is worth observing that Cross was discharged over 13 months after the filing of his workers' compensation claim. That lapse of time alone has to be viewed as seriously damaging (if not indeed fatal) to Cross' retaliation claim.

In the related context of retaliatory discharge claims under Title VII, "a substantial time lapse...is counter-evidence of any causal connection" (*Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001), quoting *Johnson v. University of Wis. Eau Claire*, 70 F.3d 469, 480 (7th Cir.1995)). Although no express bright line rule has been specified as to how long a lapse of time is too great to entertain such a retaliation claim, "[t]he inference of causation weakens as the time between the protected expression and the adverse action increases, and then 'additional proof of a causal nexus is necessary,'" (*Oest, id.,*

---

**14.** [Footnote by this Court] Only last Friday our Court of Appeals reconfirmed and applied the just-quoted doctrine in *Tullis v. Townley* *Eng'g & Mfg. Co.*, 243 F.3d 1058 (7th Cir. 2001). More on *Tullis* later.

quoting *Davidson,* 133 F.3d at 511). Thus our Court of Appeals "ha[s] permitted retaliation charges to proceed in the face of long intervals only when additional circumstances demonstrate that an employer's acts might not be legitimate" (*Oest, id.*)— and it has expressly held a one-year lapse "to be too attenuated to raise an inference of discrimination" (*id.* at 616 n. 8).[15]

In the present context the 13–month gap suffices at least to impose on Cross the obligation of making such a showing. And in those terms Cross has utterly failed to meet his task. In his half-page discussion of his retaliation claim (C. Mem.6–7), which is entirely devoid of any legal analysis or citations, Cross does no more than to adduce two assertedly probative pieces of evidence:

    1. C. Mem. 6 says that he has "provided evidence indicating animus on the part of Ryder management regarding [Cross] seeking workers compensation benefits."·

    2. C. Mem. 6 cites Cross' own Ex. A and contends that "even a cursory analysis of [Ex. A] leads to the inescapable conclusion that the suffering of an on-the-job injury of any significance is a sure ticket to eventual discharge."

Neither assertion goes any distance toward saving Cross' final claim.

As for his "animus" argument, Cross refers only to his own deposition testimony in which he said that he felt Pretzer "was very ugly about [his workers' compensation claim], you know, we ain't paying your doctor" (Cross Dep. 200). But even if more probative force were to be stuffed into that generalized personal impression than it would warrant, any mindset that Pretzer might have had on the subject is irrelevant: No evidence exists to suggest she had any input toward, or any other connection with, the decision to terminate Cross (here *Hiatt,* 26 F.3d at 768–69 presents a striking parallel, calling for rejection of Cross' argument).

■ Cross' second contention is equally without merit. For starters, Cross has tendered no real support for his conclusory assertion that the filing of a workers' compensation claim is a "sure ticket to eventual discharge" (C. Mem.6).[16] But even if this Court were able to ignore that eviden-

---

**15.** This Court is not aware of any Illinois decision that has allowed such a retaliation claim to proceed where the gap between the relevant actions has even approached 13 months. Typically the time frame must be considerably shorter for a retaliatory claim to be potentially actionable (see, e.g., *Maye v. Human Rights Comm'n,* 224 Ill.App.3d 353, 362, 166 Ill.Dec. 592, 586 N.E.2d 550, 556 (1st Dist.1991)).

**16.** In purported support of that contention, Cross cites his own Ex. A, which is no more than a list of names of approximately 2,400 Ryder employees who filed workers' compensation claims in 1995 and 1996. Cross' discussion of what that list allegedly discloses is extraordinarily cursory, impermissibly thrusting on this Court the obligation to "hunt for truffles" (*Ehrhart v. Secretary of Health and Human Servs.,* 969 F.2d 534, 537 (7th Cir. 1992)) that might support his position. That

alone would justify rejecting Cross' contention. But even a brief look at Ex. A also confirms Ryder's explanation that Cross' counsel has mistaken a critical aspect of the information conveyed in the "Return to Work" and "Termination Date" categories, as well as demonstrating the falsity of the asserted proposition that "the suffering of an on-the-job injury of any significance is a sure ticket to eventual discharge" (C. Mem.6). Even a brief review of random pages of the Exhibit (work that this Court should not have been required to undertake on Cross' behalf) refutes that. Parenthetically, Cross' faulty characterization of Ex. A in that respect is in ironic tension with his Title VII assertion that similarly situated non-African American employees were treated more favorably than he was. That just exemplifies Cross' pattern of asserting whatever suits his purposes for the moment—and consistency be damned.

tiary insufficiency, it would not help Cross because his argument misses a basic point. It is well settled that an employer may fire an employee for excessive absenteeism even if the absenteeism is caused by compensable injury (see, e.g., *Hess v. Clarcor, Inc.*, 237 Ill.App.3d 434, 450, 177 Ill.Dec. 888, 603 N.E.2d 1262, 1273 (2d Dist.1992)). Nothing about Cross' barebones contention is inconsistent with the proof that he (and other Ryder employees) were fired as a result of Ryder's 12 month absence-from-work policy, as Ryder has contended all along.

To return to the newly announced decision in *Tullis*, it is difficult to imagine a starker contrast than that between the factual matrix found sufficient to pose a jury question in that case and the evidentiary vacuum offered up by Cross here. Cross' situation is far more akin to that in *Horton v. Miller Chem. Co.*, 776 F.2d 1351, 1357 (7th Cir.1985)(discussed in *Tullis*, 243 F.3d 1058, 1061), *Miller v. J.M. Jones Co.*, 225 Ill.App.3d 799, 806–08, 167 Ill.Dec. 385, 587 N.E.2d 654, 660–61 (4th Dist.1992)(discussed in *Tullis*, 243 F.3d 1058, 1061) and *Hiatt*, 26 F.3d at 768–69 (discussed in *Tullis*, 243 F.3d 1058, 1061), each of which rejected a like retaliatory discharge claim as a matter of law. Hence *Tullis* really underscores the propriety of a similar dismissal here.

In sum, Cross' retaliation claim is doubly flawed by reason of (1) the 13–month gap between Cross' filing of his workers' compensation claim and his termination and (2) his total inability to show a causal relationship between those two events. So he has fallen flat on his retaliation claim too.

### Conclusion

There are no genuine issues of material fact on any of Cross' claims, and Ryder is entitled to a judgment as a matter of law on each of them. This action is dismissed with prejudice.