In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3313

William G. Tullis,

Plaintiff-Appellee,

v.

Townley Engineering & Manufacturing Co., Inc.,

Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Illinois.
No. 97-4287-JLF--James L. Foreman, Judge.


Argued February 15, 2001--Decided March 16,
2001


   Before Flaum, Chief Judge, and Bauer and
Rovner, Circuit Judges.

   Flaum, Chief Judge.  Townley Engineering
& Manufacturing Company, Inc. ("Townley")
is appealing the jury verdict in favor of
William G. Tullis concerning a
retaliatory discharge claim under the
Illinois Workers' Compensation Act. For
the reasons stated herein, we affirm.

I.  Background

   Townley hired William G. Tullis in
February of 1992 at its Eldorado,
Illinois plant for the position of
"sandblaster." The company manufactures
and supplies products used in mining and
coal-fired power plants. After occupying
the position of sandblaster for
approximately 18 months, Tullis was
assigned to the production job known as a
"jigger" in the summer of 1993. In this
position, Tullis assembled and
manipulated objects of varying size and
weight, preparing them for the
application of a urethane lining. During
the morning of January 25, 1996, Tullis
sustained a back injury while lifting a
mold. He was taken to a hospital

emergency room and was told not to return to work on that day or the next. The physician assistant also advised Tullis to rest for 72 hours and to make an appointment for that Monday, January 29 with his doctor. On that day, Tullis went to see his family physician, Dr. Cserny, and was given a work slip which said, "Patient advised to remain on light duty from 1-30 to 2-2 of '96 and resume usual activities." Tullis returned to work on January 30 and was placed on light duty. The very same day, a work-related accident report was prepared and filed with the State and Townley's workers' compensation insurer to allow Tullis to receive payment of his medical bills. During the months of February, March, and April Tullis remained on light duty at various times as a result of his injury. Because of continued back pain, Dr. Cserny referred Tullis to Dr. Cannon, a neurosurgeon for an evaluation and possible treatment in June. Dr. Cannon diagnosed Tullis' condition as musculosketal pain and recommended physical therapy. Upon completion of physical therapy and an MRI, Dr. Cserny on July 18, 1996 gave Tullis a physician's work slip that said he was able to resume full duty. The day Tullis received this work release, he gave it to Virgil Sanders, Townley's Eldorado general manager, and it was agreed that Tullis could return to his regular duties as a jigger with the instruction that he could do whatever made him feel comfortable.

   Less than six weeks later, on August 27, Tullis called the company and said that he would not be at work because he was going to see his doctor concerning back pain. After a visit with Dr. Cserny, Tullis spoke with Sanders and read him the contents of a work slip that Dr. Cserny provided him that stated he could not return to his present job because of his back pain, but he could do lighter duty work. At this point, Sanders' and Tullis' versions of what transpired diverge. Tullis claims that he read Sanders the note from Dr. Cserny, which said he probably needed to change jobs and do lighter duty work. In what Tullis perceived as a "firmer type response," Sanders said, "Bill, we have nothing else lighter. The doctor says you can't do this and that and [we] really have nothing you can do except lay you off and

let you draw unemployment. That way you would still have some type of income." Sanders, however, qualified this statement by stating that he would call the main office in Florida to see how it wanted to proceed and it was agreed that Tullis would call Sanders the following day about his situation. In hopes of not being terminated, Tullis asked Sanders if there was the possibility that he could be transferred to the rubber plant in Harrisburg, Illinois, stating that he wanted and was willing to work. As per their arrangement, Tullis called Sanders on August 28 and Sanders said that he had not found anything out yet from the Florida office, but that all he could do was lay off Tullis so that he could receive unemployment, ensuring that Tullis would have some type of income. On August 29, Tullis contends that he once again called Sanders about his status and received basically the identical answer from Sanders as he had gotten the day before. Consequently, on August 30, he filed for unemployment benefits because he believed that he had been laid off.

Sanders recalls the exchanges between himself and Tullis differently. He remembers Tullis saying that despite Dr. Cserny finding nothing wrong with his back, he still experienced pain. He therefore wanted to know if there was a lighter duty job available. According to Sanders, he instructed Tullis to report to work the following day. Nevertheless, Sanders requested that Tullis call him the next day, because he was going to the corporate offices in Florida then, and would talk to Toro Townley, the president of the company, about finding Tullis a lighter job in an area other than production. Sanders denies ever having communicated to Tullis that he would be laid off and could draw unemployment. As for the August 28 conversation, Sanders claims that he told Tullis that he had not been able to talk with Townley yet, but he agreed to call him if he could find a position available for him outside of the production area. According to Sanders, he never spoke with Tullis on August 29.

Sanders stated that he finally spoke with Toro Townley on August 31 about Tullis' situation. He informed him that Tullis had a problem with his back and needed something lighter to do. Sanders

characterized Tullis as a "fairly good worker," but reported to Toro Townley that he had not heard from Tullis since August 28. Townley then stated, "If he hasn't reported in it sounds like he has quit." Sanders inquired with Townley about whether that was the approach he desired to take and Toro Townley said it was since it was Tullis' "responsibility to call us." According to Sanders, Townley had in place a policy that an employee is considered to have quit if he or she is absent for three days without notifying the company. Sanders dictated a memo that stated that Tullis was dismissed as of August 30 because he failed to report to work on more than three consecutive days.

Tullis filed an application for adjustment of a workers' compensation claim on September 16 and Sanders was informed of this adjustment request shortly after it was received by Townley in early October./1 During this same time period, on September 10, Townley filed an objection to Tullis' unemployment insurance claim. In November of 1996, Tullis called Sanders and advised him that he had obtained a full medical release and that he was ready to return to work. According to Tullis, Sanders said, "the last time we heard from you was in August. The next thing we know we are getting a letter from a lawyer. You're suing us."/2 According to Sanders, he told Tullis that he did not have a position available for him. Tullis claims that Sanders said he would call him if a position became available. Nonetheless, since Tullis left in August of 1996, the company had filled vacancies and re-hired other employees who had quit. Tullis was never contacted about a job opening.

Tullis brought an action against Townley. In Count I, he claimed that he was discriminated against in violation of the Americans with Disabilities Act ("ADA"). In Counts II and III, he argued that he was retaliated against for exercising his rights under Illinois' Workers' Compensation Act (based upon supplemental jurisdiction),/3 and sought compensatory (Count II) and punitive (Count III) damages. Tullis' claims went to the jury. On his ADA claim, the jury returned a verdict for the defendant. With regard to the retaliatory discharge

claim (Count II), the jury returned a verdict for Tullis and awarded him $15,925.04 in lost wages and $80,185.68 as nonpecuniary damages for "mental anguish and inconvenience." His claim for punitive damages (Count III) was dismissed as a matter of law. Townley then made a motion for judgment as a matter of law, or in the alternative, a motion for a new trial, both of which the district court denied. Townley now appeals seeking that we grant a new trial with regard to the retaliation claim. Townley also requests that we grant a new trial or remittitur with regard to the $80,185.68 judgment for nonpecuniary damages.

II. Discussion
A. Retaliatory Discharge Claim

When considering a motion for a new trial based on the sufficiency of the evidence, we grant such a request only if the verdict is against the manifest weight of the evidence. See Lowe v. Consolidated Freightways of Del., Inc., 177 F.3d 640, 641 (7th Cir. 1999); Riemer v. Illinois Dep't of Transp., 148 F.3d 800, 806 (7th Cir. 1998). We review a district court's application of this test in a deferential manner. Lowe, 177 F.3d at 641; Riemer, 148 F.3d at 806. A district court's denial of a motion for a new trial will be reversed only upon a showing that the court abused its discretion. Id. We will not set aside a jury verdict if there exists a reasonable basis in the record to support the verdict. See Jackson v. Bunge Corp., 40 F.3d 239, 244 (7th Cir. 1994).

Under Illinois law, a valid retaliatory discharge claim requires a showing that: (1) an employee has been discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy. See Hartlein v. Illinois Power Co., 601 N.E.2d 720, 728 (Ill. 1992). More specifically, in a workers' compensation situation, a plaintiff must show that he or she: (1) was the defendant's employee before his or her injury; (2) exercised a right granted by the Workers' Compensation Act; and (3) was discharged from his or her employment with a causal connection to his or her filing a workers' compensation claim. See Kritzen v. Flender Corp., 589 N.E.2d 909,

915 (Ill. App. 1992). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." Hartlein, 601 N.E.2d at 728.

Townley argues that Tullis has not proven that his discharge was causally linked to the exercise of his rights protected under the Illinois Workers' Compensation Act. According to Townley, Tullis presented no direct evidence to support his retaliatory discharge claim. Instead, he relied upon circumstantial evidence, such as that of David Fox, Tullis' supervisor, who documented Tullis' departures from light duty restrictions (failing to wear his back brace and swinging a sledgehammer) because he thought the information may be relevant to a workers' compensation claim that Tullis might file in the future. Although Tullis believes this is evidence of Townley's animus toward a worker's right to make a compensation claim, Townley contends that there is no Illinois law prohibiting an employer or its carrier from challenging the nature and severity of a worker's claim of injury. Moreover, Tullis maintained that Townley's internal memoranda had variances regarding when Tullis quit because he failed to report for work. The Eldorado plant's memorandum showed that Tullis was terminated as of August 30, while Townley's Florida home office records show Tullis as having been terminated as of August 27. According to Tullis, such a discrepancy reveals that the company's reason for terminating Tullis was pretextual and evidence of an illegal purpose. Townley argues that the internal inconsistencies between the Eldorado plant and the company's home offices in Florida about when Tullis was terminated is a result of incomplete and/or miscommunication between the two offices and not a scheme to harm Tullis. Additionally, Townley claims there is no evidence that Townley actually had a motive to punish Tullis, and in August of 1996, he had no pending workers' compensation claim. Townley asserts that Tullis already was receiving benefits and had been since January of 1996. According to Townley, Tullis does not dispute that he took no action in August of 1996 to suggest or inform Townley that he intended to file an application for adjustment of his workers' compensation

claim. Therefore, Townley asserts that it had no reason to anticipate or expect in August that Tullis would demand such an adjudication of his claim in the following month or any time in the near future. For the six months during which Tullis was on light duty, Townley allowed him, without any objection, paid time off to receive medical treatment. According to Townley, no one ever said or discouraged Tullis from seeking an adjustment of his workers' compensation claim or that if he did he would suffer any consequences. Townley further asserts that it is speculation on the part of Tullis that he was being punished for filing workers' compensation claims.

Townley proposes that we should adopt the reasoning of Horton v. Miller Chem. Co., 776 F.2d 1351 (7th Cir. 1985). In that case, a jury returned a verdict in favor of the plaintiff for a retaliatory discharge claim under the Illinois Workers' Compensation Act, the district court refused to grant a judgment notwithstanding the verdict ("j.n.o.v."), and we reversed the trial court's decision. In Horton, the plaintiff claimed that he was referred to as "a bad risk" because the company believed that he might seek additional compensation under the Act. Id. at 1357. This was per ceived as rather "scant" evidence, especially when one considered the other evidence presented. Id. Townley argues that as was the case in Horton, id., there was no evidence presented that any employees said anything to Tullis about filing a workers' compensation claim, Townley did not oppose his pursuit of his rights under the Act, and he was given time off of work to receive medical treatment. Accordingly, Townley contends that Sanders' statement about "You're suing us" in and of itself cannot lead to an inference that Townley retaliated against Tullis, as Horton warns.

Townley claims that Miller v. J.M. Jones Co., 587 N.E.2d 654 (Ill. App. 1992), is another case that reveals that Tullis' retaliatory discharge case is not viable. Miller too pursued a retaliatory discharge claim and at the close of presenting his case, the court ordered a directed verdict in favor of the defendant, which the appeals court upheld. Despite Miller's claim that a supervisor told him that the company was

"trying to break him" by assigning him to a particular job, the court remained unconvinced that this evidence showed an intent on the company's part to interfere with Miller's rights under the Workers' Compensation Act. Id. at 660. Townley contends that Sanders' statement was "mild and tangential" compared to the one in Miller. Townley believes that the jury rested its decision on the disbelief of the denials of Townley's witnesses, and as a consequence, determined Tullis was retaliated against for asserting his rights under the Workers' Compensation Act. See id. ("Although a jury decides questions of credibility, a jury will not be allowed to rest a decision for plaintiff entirely on its disbelief of the denials made by defendant's witnesses."). Townley, as discussed earlier, argues that it never interfered with Tullis' ability to pursue his benefits, which was also the case in Miller, id. Even the president of Townley, Toro Townley, said that in the 37 years of the company's operation, it had never been sued with regard to a workers' compensation claim. See id. ("The fact that defendant did not retaliate against other employees who had filed workers' compensations claims should also be given weight."). Townley contends that Miller supports its position that Tullis has failed to successfully make out a retaliatory discharge case.

   Finally, Townley would like us to consider Hiatt v. Rockwell Int'l Corp., 26 F.3d 761 (7th Cir. 1994), in which we reversed the district court and granted a j.n.o.v. with regard to Hiatt's retaliatory discharge claim under the Illinois Workers' Compensation Act. In that case, the Court said that even if it assumed that Hiatt's supervisor harbored animosity toward his pending workers' compensation claims, "Hiatt still bore the burden of proving that this animosity played a causal role in his termination. This he has not done." Id. at 769. As a result, Hiatt did not show "that those in charge of his actual discharge possessed an impermissible ulterior motive." Id. Townley argues that Tullis has not shown that it possessed an "impermissible ulterior motive," id., when it terminated Tullis and decided not to rehire him. Tullis, without notifying the office, did not report to work for three days, and as

per company policy, Townley terminated him. Tullis' back injury played no role, according to Sanders, in his decision not to rehire Tullis. What was important to him was that he "felt [he] had went above and beyond [his] call of duty" by allowing Tullis to come to work to do "as little as he possibly could do" and offering to talk with Toro Townley about finding another position for him outside the production area. What upset Sanders was that Tullis never called the office to say he would not be working and he never even called a week later or at that point brought in a doctor's note. Sanders decided not to rehire Tullis because he expressed, "I'm honest with my workers. I treat them with respect. I expect the same kind of treatment in return and that's all I ask of my people." Townley asserts that it provided a credible explanation for why it did not rehire Tullis and he provided no evidence to counter Townley's witnesses' testimony that the company was not motivated to terminate him in any way by his filing for an adjustment of his workers' compensation benefits.

While Townley raises several reasons as to why a new trial would be appropriate in this case, its position is not a prevailing one. This was, as the district court acknowledged during the trial, "a very close case" on the issue of retaliation. However, the retaliatory discharge claim was before the jury, it found in favor of Tullis, and the district court denied Townley's request for a new trial on the issue. At this stage in the process, we have to assess whether there is a reasonable basis in the record to support the jury's verdict. The record does provide us with evidence that the jury could have relied upon to determine that Townley discharged Tullis in retaliation for his workers' compensation claim. We begin by reviewing the manner in which Tullis came to no longer work at Townley. Townley stressed that it had in place a policy that an employee would be terminated if he or she failed to notify the office on more than three consecutive days that he or she would be absent and Tullis allegedly violated said policy. The employee handbook states in contradiction that "You will automatically be deemed to have quit, without notice, if you are absent more than one day without promptly reporting

to the company an acceptable reason for the absence." Toro Townley explained that although the handbook may indicate that the company does not even allow for a one-day absence without notice, "That policy has been changed and is not in writing, but it's well known throughout our company." David Fox, a supervisor who had worked for Townley since 1983, said that he did not believe he was familiar with the policy that if you missed three consecutive days of work without calling in that you were terminated. Fox's testimony may have raised doubts about the legitimacy of the company's termination policy and in turn its reliance upon this purported policy to terminate Tullis. Townley argues that it terminated Tullis because he failed for more than three consecutive days to notify anyone that he would be absent from work. Tullis argues that he did converse with Sanders on August 27, 28, and 29, but as of August 27 Tullis believed that he had been laid off. He said that he did not call the plant on August 28 to say that he would be absent because he thought there "was no need to" do so considering he was laid off. Once again, there is conflicting evidence concerning why Tullis left his job at Townley. Indeed, Sanders himself said that he "had no idea" whether Tullis had quit or not, nor did he ever contact Tullis to find out why he had not come to work on August 28, 29, 30, and beyond. He acted in this manner despite the fact he thought Tullis was a good worker. Tullis testified that no one ever contacted him to inform him that he was terminated. All of this testimony combined may have led the jury to be suspicious about why Townley, without any apparent hesitation, decided to enforce its attendance policy against Tullis.

Other evidence was presented that may have further caused the jury to doubt Townley's motive. For instance, Townley claimed that it had never discriminated against an employee for seeking workers' compensation benefits. This statement may have seemed a bit hollow in light of the fact Toro Townley admitted that no other employee had ever filed an application for adjustment of a workers' compensation claim. Once more, Toro Townley was well aware when he was discussing with Sanders terminating Tullis because he had violated the company's alleged attendance policy, that there was a "possibility"

that Tullis might file for adjustment of his workers' compensation claim. David Fox, the supervisor of the plastic shop, made the following notations about Tullis' behavior: (1) in May he had told Tullis to put on his belt (a back brace) after he saw him rolling out molds without it, and (2) during June he was told that Tullis was observed swinging a sledge hammer and lifting heavy objects. Fox acknowledged that he made these notes because he believed that Tullis might file a workers' compensation claim sometime in the future and he wanted to document his behavior in the event it was necessary to challenge him with such information. The jury may well have been left with the impression that Townley was conscious of Tullis' right to file an adjustment of his workers' compensation claim and that this motivated the company to either lay off or terminate him based upon its attendance policy.

As for Townley's failure to hire Tullis in November of 1996, there was also evidence in the record to support the proposition that the company based its decision upon Tullis' filing for an adjustment of his workers' compensation benefits. When Tullis told Sanders that he could return to work, Tullis claims that Sanders said, "[T]he last time we heard from you was back in August. The next thing we know we are getting a letter from a lawyer. You're suing us." His tone according to Tullis was angry and unfriendly. According to Tullis, Sanders said he would call him if a job opening became available and he never did so. Sanders hired other people to fill vacancies and there was no evidence presented that the company did not have a vacancy suitable for Tullis. The comment about Tullis suing Townley made by Sanders along with his behavior after Tullis inquired about a job reasonably could have led the jury to believe that Townley did not rehire Tullis because he filed a workers' compensation claim.

This case is distinguishable from Horton, Miller, and Hiatt. As evidenced by the preceding discussion, this case is not like Horton or Miller, in that it does not center around one particular comment with no supporting facts or completely fails to suggest an "impermissible ulterior motive," as was the case in Hiatt, 26 F.3d at 769. During

the trial, there was conflicting evidence presented about why Tullis stopped working for Townley. In addition, there was evidence that David Fox was keeping notes about Tullis' work habits in case of a workers' compensation claim and Toro Townley was well aware that Tullis had the right to file for an adjustment of his claim when he decided to terminate him. In the end, the case centered largely around credibility determinations, and it is within the purview of the jury to make such determinations. The jury reasonably could have ascertained based on the record that Townley terminated Tullis in August when it had the chance to do so because it no longer wanted to deal with his recurrent back problems and attendant workers' compensation claims. In addition, based on the evidence, the jury could have rea sonably found that Townley did not rehire Tullis because it was upset that Tullis pursued an adjustment of his claim. Unlike in Horton and Miller, Sanders' comment more clearly referred to Tullis' adjustment claim and thus provided the jury with the opportunity to make the connection that Tullis was not rehired because he pursued such a claim. Furthermore, the jury could have taken into account the manner in which Townley handled Tullis' absences in August and eventual termination as shedding light upon its decision not to rehire Tullis. In this case, the jury based on the record reached a reasonable conclusion that Townley terminated and/or refused to rehire him in November of 1996 because he filed an adjustment claim for his workers' compensation benefits./4 Therefore, we will not find that the district court abused its discretion when it allowed the jury verdict to stand.

B. Compensatory Damages

Townley contends that the $80,185.68 nonpecuniary damages jury award for "mental anguish and inconvenience" was the product of passion and prejudice and so it requests a new trial or reduction of the damages through remittitur. Townley is concerned about the massive and excessive size of the jury award. The district court reviewed Townley's request for a new trial based upon the nonpecuniary damage award and determined that the award should be upheld. We review the district court's refusal to

grant a new trial on the basis that the damages the jury awarded were excessive for an abuse of discretion. See Riemer, 148 F.3d at 808.

When we review a compensatory damages award, we employ the following three-part test: (1) whether the award is monstrously excessive; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. Id. Townley argues that the jury award for $80,185.68 fails all three prongs of this test. Specifically, Townley claims that the award is monstrously excessive because it is based exclusively upon Tullis' own testimony. No physician or other professional testified that Tullis suffered psychologically from Townley's conduct nor did Tullis or a family member, friend, or other lay witness testify to his emotional injury. Instead, Tullis said that he felt "low" and "degraded" by his employer's conduct in August of 1996 and "back-stabbed" when the company opposed his unemployment compensation. He stated that he experienced "financial difficulties" as a result of his unemployment, such as: difficulties in paying utility bills, borrowing money from family or friends, falling behind in payment of child support, an inability to obtain new school clothes for his children, and to take his children "to do the Wal-Mart, McDonald['s] thing." Townley asserts that Tullis' testimony was not very detailed and thus does not support the award. Further, Townley notes that Tullis did not claim that he suffered from periodic depression, fits of anger, or other physical symptoms. According to Townley, all of this combined displays that Tullis' award for mental anguish and inconvenience was monstrously excessive.

Townley also maintains that the award is not rationally related to the evidence and that Tullis did not make a specific request with regard to compensatory damages; rather he asked the jury to "do what's fair." Townley argues that the problem is that the evidence does not support the amount awarded. For instance, in Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219, 1229-30 (7th Cir. 1995), the court found damages for $21,000 because of emotional distress

were excessive, even though the plaintiff in that case cried as a result of being discharged from a job that he had been at for 13 years and experienced such distress several years after he had been fired. Tullis, according to Townley, has provided far less compelling evidence regarding the intensity and duration of his emotional distress. Similarly, in Fleming v. County of Kane, 898 F.2d 553, 561-62 (7th Cir. 1990), the Court found a $40,000 award, which had been reduced to this figure from the jury's amount of $80,000 by the trial court, was proper. The plaintiff in Fleming had been discharged for his whistle-blowing activities. Fleming testified to feelings of embarrassment, humiliation, certain depression, serious headaches, and sleeplessness. His wife and fellow department employees supported his testimony concerning his physical and emotional condition. Once again, Townley asserts that Tullis did not provide nearly the same type of evidence as was presented in Fleming, yet he received a substantially greater award, and these cases suggest that Tullis' nonpecuniary damage award is not rationally related to the evidence that he presented.

Finally, Townley advances that the jury award is not comparable to awards in similar cases. As previously discussed, the award in this case is larger than in Avitia, 49 F.3d at 1230 ($10,500 award after remittitur), and Fleming, 898 F.2d at 561-62 ($40,000 award). While it may be true that in Kasper v. Saint Mary of Nazareth Hosp., 135 F.3d 1170, 1174 (7th Cir. 1998), a compensatory damage award for a retaliatory discharge claim in the amount of $150,000 was upheld, this was because the award was not challenged. Similarly, in Jackson, 40 F.3d at n.5, a case involving a retaliatory discharge claim under the Illinois Workers' Compensation Act, the parties agreed to compensatory damages in the amount of $75,000. Finally, in Peeler v. Village of Kingston Mines, 862 F.2d 135 (7th Cir. 1988), the court addressed a $50,000 award for emotional distress based upon a retaliatory discharge claim. In that case, the evidence presented relayed "[p]oignant scenes of distress and abysmal poverty," while the plaintiff was unemployed. Id. at 138. There, the plaintiff was evicted from his house, forced to live in a truck for three days, depended in part on charity to feed his

family, used rags to diaper his child, friends donated clothes for his five children, could not afford a doctor when his children were sick, and suffered health problems. Townley argues that Tullis' experience does not rise nearly to this level and thus $80,185.68 is simply not warranted.

The record in this case, despite Townley's assertions, indicates that the evidence presented at trial supports the $80,185.68 jury award for mental anguish and inconvenience. Tullis testified that he "felt low" and "degraded" as a result of being laid off from Townley. He described himself as someone who worked for Townley for five years with "total dedication" and "[d]one whatever they asked me." However, he said, "There was one minor incident with my back and it was like I was useless to them anymore. I wasn't what I was. I was a hassle. They had to have people watching me to see if I made any wrong moves. [I] just felt totally degraded and totally like all I done there was useless." Then, when the company opposed Tullis' unemployment, he stated that he felt "back-stabbed" and had trusted Townley up until that point and "told them everything that was going on." When he learned that he was going to be laid off and would get his first check, he described this turn of events as, "I was starting to get back in some sort of rhythm of my life again and wham, they just stopped it [by opposing the unemployment]." It was at this point that Tullis sought the assistance of a lawyer and filed for an adjustment of his workers' compensation claim. From December 1, 1996 through October of 1997, Tullis did some "odd and end jobs" and earned approximately $600 to $700. During this nine- or ten-month period, he testified that the financial difficulties he experienced included, "We had trouble keeping our utility bills paid. We had to get the phone sometimes shut off or lights shut off momentarily, gas. Borrowing money from friends or relatives, mainly relatives. My child support got behind and ended up costing me a lot later on down the line. And the kids weren't able to get the new school schools. They weren't able to do the Wal-Mart, McDonald['s] thing. Just things were changed to a lower type of income." Although Tullis tried to find a job in the area of southern Illinois, which

presumably is within the vicinity of his home, the only position he could obtain that paid him as much as his job at Townley was as a truck driver.

Although Townley characterizes Tullis' testimony regarding his emotional distress and inconvenience as relatively meager and scant, the jury obviously did not perceive it this way considering the award they granted Tullis. An award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress. See Merriweather v. Family Dollar Stores of Ind., Inc., 103 F.3d 576, 580 (7th Cir. 1996). "It is within the jury's province to evaluate the credibility of witnesses who testify to emotional distress, and we shall not disturb those credibility determinations on appeal." Bruso v. United Airlines, Inc., 239 F.3d 848, 857 (7th Cir. 2001). The jury was able to observe Tullis when he was testifying and they apparently found his testimony to be sincere and sufficient to convince them that he merited the award they gave him.

The jury, as seen by the amount they awarded Tullis, which some may even characterize as exceedingly generous, must have not believed that Tullis needed to show that he sought the help of psychologists or friends for his emotional distress or that he was required to provide more detail about either his emotional distress or the inconvenience that he experienced. Tullis' testimony did reveal he felt "low" and "degraded" when he was laid off and "back-stabbed" when the company opposed his unemployment claim. He also said that he was without work for nine to ten months, and this affected his personal life, including that he had to borrow money from family and friends and he had his lights and phone shut off. The jury could have determined that these were not minor events. The jury also may have taken into account that his family life was disrupted in that he was not able to buy his children new schools clothes, pay his child support, or take his children out dinning and shopping. Tullis also did find a new job, but it was as a trucker, which required him to be away from home, and he even said that Townley "was a very convenient place for [him] to work at because it was close to

the house. It was five minutes from the house." The jury may very well have found that these types of changes were significant to Tullis' family situation. Because it is within the jury's domain to assess the credibility of witnesses, specifically in this case the testimony of Tullis, we cannot find that the award was monstrously excessive or not rationally connected to the evidence. Further, since we have determined that the verdict was supported by the evidence, then necessarily it was not a result of passion and prejudice. See Slane v. Mariah Boats, Inc., 164 F.3d 1065, 1068 (7th Cir. 1999).

Thus, our remaining task is to examine "whether the award is out of line with other awards in similar cases." Fleming, 898 F.2d at 561. Townley cites Avitia, 49 F.3d 1219 and Fleming, 898 F.2d 553, as cases that are roughly comparable and resulted in damage awards that were not nearly as substantial as the award in this case. Avitia, however, involved emotional distress only and not inconvenience. 49 F.3d at 1227-30. Similarly, in Fleming the damages concerned emotional distress, and unlike in this case, we affirmed the trial court's determination that a remittitur, reducing the damages to $40,000, was appropriate. See 898 F.2d at 561-62. More recently, we affirmed without much commentary, a $50,000 compensatory award (presumably for emotional distress) for retaliatory discharge brought under the Illinois Workers' Compensation Act. See Slane, 164 at 1068. The most troubling case presented by Townley with regard to the issue is Peeler, 862 F.2d at 139, in which rather egregious facts led to the affirmation of a $50,000 compensatory award for the plaintiff. One must remember that this jury award is from 1988 and the current dollar value of this award is greater than $50,000; it is worth approximately $70,000 in 1999, see Statistical Abstract, Table 768. The Peeler award is roughly comparable to Tullis' compensatory damage award, if one takes into account the jury's right to make awards based upon its view of a witness's demeanor and credibility. We cannot conclude that $80,185.68 is not roughly comparable to the small number of similar cases (albeit in most instances distinguishable) that we have discussed. Therefore, we affirm the district court's

decision not to grant a new trial or remittitur on the issue of the $80,185.68 compensatory damage award.

III. Conclusion

We Affirm the district court's decision not to grant a new trial on the retaliatory discharge claim and its decision not to grant a new trial or remittitur for the $80,185.68 compensatory damage award.

/1 An injured employee seeking an Application for Adjustment of Claim for his or her workers' compensation benefits must file such a claim with the Illinois Industrial Commission. After an employer receives this document, it must file with the Commission a written admission or denial of the employee's allegation that the claim is covered. See 820 ILCS 305/1.

/2 Sanders referred to Tullis' application for adjustment of his workers' compensation as a lawsuit, but as Toro Townley explained, "Well, I don't think anybody likes being sued, but I don't view this as being sued. This is really an application for adjustment to a workers's compensation claim through our insurance, which I don't view that in itself as a lawsuit. We pay good money for our insurance premiums, and I expect our people to be compensated when they are injured, be it for their medical expense or be it for their lost time from work." However, Toro Townley did testify that the more the claim, the more the bills, the more the amount is paid to an employee for workers' compensation, and the higher the premium Townley would pay for insurance. Clearly, although Tullis' filing an application was not a direct lawsuit against the company, it did have the potential to affect the company's insurance premiums.

/3 The Act provides, 820 ILCS 305/4(h):

It shall be unlawful for any employer, insurance company or service or adjustment company to interfere with, restrain or coerce an employee in any manner whatsoever in the exercise of the rights or remedies granted to him or her by this Act or to discriminate, attempt to discriminate, or threaten to discriminate against an employee in any way because of his or her exercise of the rights or remedies granted to him or her by this Act.

It shall be unlawful for any employer, individually or through any insurance company or

service or adjustment company, to discharge or to threaten to discharge, or to refuse to rehire or recall to active service in a suitable capacity an employee because of the exercise of his or her rights or remedies granted to him or her by this Act.

/4 The district court told the jury that Tullis had the burden to prove: "Third, acting with intent to retaliate for plaintiff's actual or expected effort to obtain workers' compensation benefits, the defendant terminated plaintiff's employment and/or refused to rehire him." For this reason, we have not treated the termination and rehiring episodes as alternative grounds for affirming the district court's decision not to grant a new trial. It is possible that the jury viewed these two events as contributing to the retaliatory discharge or that each individual event constituted retaliatory discharge. The record, however, does not provide us with any indication, therefore either scenario is plausible.