In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3028

DANIELLE L. PICKETT,

*Plaintiff-Appellee,*

*v.*

SHERIDAN HEALTH CARE CENTER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07-C-1722—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED JANUARY 20, 2010—DECIDED JUNE 25, 2010

Before FLAUM, KANNE, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge*. Defendant-appellant Sheridan Health Care Center ("Sheridan," "the Center") appeals from an order denying its motions for a new trial and remittitur. A jury found that Sheridan fired plaintiff-appellee Danielle L. Pickett in retaliation for her repeated complaints about sexual harassment by residents of the defendant's nursing home. The jury awarded $15,000 in compensatory damages and $50,000 in punitive damages for this violation of Title VII. For the following reasons, we affirm.

## I. Background

Plaintiff-appellee Danielle L. Pickett is a thirty-one year-old woman who resides in Zion, Illinois. She began working for Sheridan on January 10, 2005, first as a dietary aide and then, starting in September 2005, as a house-keeper. Between November 2005 and January 2006, residents of the nursing home twice made lewd remarks and inappropriately touched Pickett while she was cleaning their rooms. Pickett notified her supervisor, who said that Pickett should no longer clean those residents' rooms alone and should instead request a security escort prior to entering the problem quarters. Pickett testified, however, that Sheridan staff always claimed to be busy when she needed their assistance and that she began to clean the individuals' rooms only when she could first spot them occupied elsewhere in the facility.

On June 24, 2006, a third incident took place where a resident cornered and groped Pickett. The following day, unbeknownst to Pickett, Julie Stangel, the Assistant Director of Nursing at Sheridan, reported the events to Zion police. Officers came out to the home to speak to the appellee, but she declined to file a police report after receiving assurance from one Ms. Paynter, the Vice President of Operations (whose first name appears nowhere in the record), that the offending resident would be moved out of the Center. After the meeting, Paynter sent Pickett home two hours before her shift was scheduled to end.

On June 27, 2006, Pickett met with several individuals to discuss the third incident and attempt to find a way

to remedy the persistent harassment. Present for the discussion were Paynter; Diane Lee, Pickett's union stewart representative (Pickett testified that she asked Lee to attend because she was intimidated by the meeting); Craig Barnes, Pickett's direct supervisor; and Paul Ross Zeller, Sheridan's Administrator. Zeller and Paynter did most of the talking; Pickett testified that they suggested she invited the conduct. In particular, Paynter commented "well, you are a pretty girl, what are you doing to make them want to touch you?" According to Pickett, Paynter also claimed that because the first resident only asked appellee for sexual favors and did not attempt to grab her, the encounter did not amount to sexual harassment. The meeting concluded with the participants agreeing to reassign Pickett from cleaning the residents' rooms to taking care of the common areas on the first floor. No one mentioned the possibility of disciplinary action against appellee.

When Pickett came in to work at 7:30 a.m. the next morning on June 28, she asked Zeller to help her retrieve a vacuum cleaner. She then asked to speak to Zeller about the steps Sheridan has taken to protect her from harassment by residents. Appellee and Zeller continued this discussion in Zeller's office, where Pickett stated that she was not satisfied with the remedial measures implemented by Sheridan in response to the June 24 incident and its precursors. Zeller and Pickett provided conflicting testimony about what was said during the meeting, but both agree that Pickett complained that the assailant from June 24 was still in the facility despite Paynter's promise to remove him. At some point, Pickett told Zeller: "You're treating this like a store where the

customer is always right. This is not right." According to Pickett, Zeller responded "maybe you should go and clean some stores." Zeller denies saying this. Pickett also testified that Zeller said: "[T]his [Sheridan] is their home. I mean nothing is going to change," though Zeller could not recall at trial whether he actually made the last remark. Pickett then became upset and began to cry because she feared that her job was in jeopardy. She told Zeller that her children were depending on her and that she did not want to lose her job.

At that point, the meeting ended and Zeller went out into the hall to open the storage closet to give Pickett the vacuum cleaner. She was still in tears when he walked away. A few minutes later, Zeller called the receptionist to ask if she had seen Pickett. The receptionist said "no," but called Zeller soon thereafter and said that Pickett had just left the building. The Sheridan employee handbook prohibits workers from walking off the premises while on the clock.

The next day, on June 29, 2006, Pickett called Zeller to clarify her employment status. She said that she understood it was wrong for her to have left the building, but that she did so only because she was upset. Appellee stated that she did not want to lose the job. Zeller responded by commenting "[y]ou did walk off the job," though he testified that he meant the phrase as a question. Pickett in turn asked, "Well, have I been fired or not?" Zeller said he would check with Paynter and call Pickett back. After conferring with the vice president of operations, Zeller phoned appellee on June 30, 2006, and said

that the two managers came to a conclusion that "it was best she part ways with the company." At trial, Zeller testified that he believed that Pickett had abandoned her job; while he knew about her financial situation, Zeller did "not believe at that period of time it was in either of our interests for her to continue working at Sheridan." Prior to June 28, 2006, Pickett had no infractions at work.

Pickett filed a discrimination claim with the Equal Employment Opportunity Commission (EEOC) on July 7, 2006. According to Zeller, around July 28, 2006, about a week after receiving notice of this claim, Sheridan or its attorneys offered to allow Pickett to return to her former employment. The offer was not conditioned on appellee dropping her legal claim, but she refused it. At trial, Pickett explained that she turned the offer down because it did not include back pay and because she was unsatisfied with Sheridan's approach to reducing her potential exposure to further offensive behavior. Appellant repeated the offer on August 23, 2006, and again on September 25, 2006, but Pickett refused each time. Pickett finally accepted the offer on January 9, 2007, and returned to work on January 23, 2007. She continues to work at the Center.

During the trial, Pickett testified about the inconvenience, emotional suffering, and loss of enjoyment of life that she experienced as a result of the discharge. She held some odd jobs between June 30, 2006 and January 23, 2007, but could not find permanent employment despite contacting the Illinois Department of Employment Security for assistance. Her job search was

hampered by the fact that she did not have a car (she moved to Zion so she could walk to work). As a result of unemployment, Pickett was nearly evicted from her apartment, could not pay her bills, and had to rely on charities for food, clothing, and Christmas gifts for her children. Her gas and electricity were eventually turned off and her phone disconnected.

Pickett also testified that some years earlier, her fiancé had been shot to death in a drive-by shooting on their son's sixth birthday. Their residence then collapsed "and her family lost everything but the clothes" on their backs. Pickett explained that despite these hardships, she did not want to go on Public Aid because she could and wanted to work. During her period of unemployment, she felt badly when her children would see her crying and ask "when are you going to work?", but did not seek medical attention for emotional distress. After Pickett returned to work, both the union representative and the Sheridan receptionist stopped talking to her. Other individuals continued to joke about the situation in a way that appellee found offensive.

Sheridan employs about 230 people at the Zion facility. Prior to Pickett's termination, it had posted the requisite information about federal employment discrimination laws on its walls. It also supplied employees with a handbook detailing its own employment and anti-retaliation policies.

Pickett originally sued Sheridan for one count of sexual harassment and one count of retaliatory firing. Following discovery, defendant-appellant moved for sum-

mary judgment. The district court awarded Sheridan summary judgment on Pickett's sexual harassment claim because the company promptly reacted to complaints in a way reasonably calculated to prevent recurrence of bad conduct. The court denied summary judgment on the retaliation claim because the parties still disagreed sharply about whether Pickett was fired for her inability to handle the harassment.

After a trial, the jury returned a verdict for plaintiff-appellee. It awarded $15,000 in compensatory damages and $50,000 in punitive damages. Sheridan moved for a new trial pursuant to Federal Rule of Civil Procedure 59(a), claiming that: (1) evidence of retaliation was insufficient to support the jury's verdict; (2) that it could not be liable for retaliation as a matter of law because the harassment took place at the hands of third-party non-employees; (3) that the admission of evidence pertaining to details of the third-party conduct animating Pickett's sexual harassment claim was erroneous and prejudicial; and (4) that statements by plaintiff's counsel about the minor impact an award of several thousand dollars would have on the defendant improperly influenced the jury. Judge Pallmeyer rejected each of these arguments. Sheridan also argued that Pickett did not provide evidence to support an award of compensatory damages and that the punitive damages award was both excessive and unsupported by law. The district court did not agree with these assertions either and denied remittitur. Instead, the district court awarded Pickett back pay in addition to the verdict amounts and permanently enjoined Sheridan from retaliating against

No. 09-3028

her. Judge Pallmeyer also mandated that Sheridan remove all references to the lawsuit and Pickett's prior complaints about sexual harassment from her employee file. Sheridan appeals.

## II. Discussion

Appellant attacks the judgment of the district court primarily by reiterating claims it made in its Rule 59(a) motion for a new trial. Sheridan thus argues that (1) "reporting the behavior of third-party non-employees is not opposition directed at an employment practice of the employer" because third parties are not agents of the employer for Title VII purposes; (2) there was insufficient evidence to support the jury verdict that Pickett was fired because of her complaints and not because she walked off the job; (3) that plaintiff's counsel improperly asked the jury to "send a message" and invoked the conduct underlying the complaint even though summary judgment established that the incidents were not themselves actionable; (4) that "[p]laintiff's damages evidence was insufficient to support anything more than a nominal damages award" because "she would not have had financial difficulties . . . had she accepted" Sheridan's offer to return in July; (5) that Sheridan could not be found to display reckless indifference or malice towards federally protected rights sufficient to support an award of punitive damages; and (6) that *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605 (2008) should be extended to the present case to limit the amount of punitive damages to that equal to compensatory damages.

A. Theory of Liability and Sufficiency of the Evidence

We review pure questions of law de novo. *Thomas v. GMAC*, 288 F.3d 305, 307 (7th Cir. 2002). We uphold a jury verdict on appeal as long as a reasonable basis exists in the record to support this verdict. *Moore v. Tuleja*, 546 F.3d 423, 427 (7th Cir. 2008). The standard of review for a denial of a motion for a new trial is abuse of discretion. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). That is, we reverse only if "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 636 (7th Cir. 1996). "Moreover, we are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and the judge (in not interfering with the verdict)." *Hybert v. The Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir. 1990).

At the outset, we remark that appellant expends significant energy developing a legal argument that is tangential to the matter before us. The parties agree that Pickett suffered sexual harassment at the hands of residents, and they also agree that the district court properly found that liability for the acts could not attach to Sheridan because the Center took prompt remedial steps. In its order granting partial summary judgment for appellant, the district court further remarked that the residents' offensive conduct may have fallen short of the severity threshold necessary to state a claim of harassment against a nursing home. *See, e.g.*, *Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001).

Sheridan attempts to assemble these findings and assorted snippets of case law into a conclusion that because Pickett's suffering stemmed from the actions of third parties that were not agents of Sheridan, Pickett's complaints were not protected expression under 42 U.S.C. § 2000e-3(a). In the absence of such expression, appellant reasons, there could be no impermissible retaliatory firing—only a dismissal not subject to Title VII scrutiny. It supports this conjecture with out-of-circuit cases explaining that '[c]omplaining about an entity's "actions outside the ambit of an employment practice is unprotected by Title VII." ' *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007); *see also Lockridge v. HBE Corp.*, 543 F. Supp. 2d 1048, 1060 (E.D. Mo. 2008) (affirming summary judgment for defendant hotel by reasoning that "not every complaint about conditions in the workplace, legitimate or otherwise, constitutes a protected activity; retaliation in response to an activity that is not protected does not support a retaliation claim."). Tellingly, the *Lockridge* court made the above statement only after observing that "[a]n informal . . . complaint about, or in opposition to, an employer's practice or act . . . [may constitute a protected activity] if the employee reasonably believes such an act to be in violation of the statute in question." *Id.* (citing *Jeseritz v. Potter*, 282 F.3d 542, 548 (8th Cir. 2002)).

So, while appellant asks us to conclude that "[t]he statutory language is unambiguous and, thus, should end the inquiry," its attempt to demand that a plaintiff demonstrate actual employer liability for conduct that may motivate her complaint before the plaintiff could

recover for a retaliatory firing based on such a complaint does not comport with existing Title VII law in this and other circuits. To prevail on a retaliatory firing theory at trial, an employee needs only to prove that an employer subjected her to an adverse employment action because she had engaged in a statutorily protected activity. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).

Besides being inapplicable, the limiting principle Sheridan seeks to evoke is invalid. Our prior decisions have repudiated the idea that sexual harassment is actionable only when committed by employees and have extended employer liability to some actions by "unaffiliated" third parties. *See Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 606 (7th Cir. 2006) (holding that an employer may be "liable under Title VII's negligence standard if it 'failed to discover and prevent' sexual harassment of an employee giving rise to a hostile work environment" where managers failed to keep a prisoner who ended up raping Erickson out of her workspace despite promises to do so); *see also Lapka v. Chertoff*, 517 F.3d 974, 984 n.2 (7th Cir. 2008) ("Employer liability can be imposed when the harassment is committed by co-workers or by third parties.").

Thus, the legal question before us is whether Pickett presented sufficient evidence to establish that Sheridan fired her in retaliation for protected conduct. "Title VII makes it unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by the Act. To prove a case of retaliation, a plaintiff

must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action at the hands of her employer; and (3) there was a causal link between the two." *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751-52 (7th Cir. 2002) (citations omitted). Under appellee's theory of the case, the protected expression in question were her complaints about Sheridan's unwillingness to adequately redress behavior she viewed as illegal sexual harassment. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1450 (7th Cir. 1994). "We have repeatedly held that a plaintiff need not prevail on her Title VII discrimination claim or have opposed an action that in fact violated Title VII to win a retaliation claim. All that is required is that 'she reasonably believed in good faith that the practice she opposed violated Title VII.'" *Fine*, 305 F.3d at 752. We agree with the district court that the "[t]he issue for the jury is what actually motivated the defendant to terminate her employment; in this case, the jury was entitled to disbelieve [d]efendant's witnesses and conclude that its motivation was in fact retaliatory."

The case came down to a choice between trusting Zeller or Pickett. If the jury favored Zeller's version of the events, it would have found that Pickett walked out on her job in violation of written policy after an entirely neutral conversation with her boss. As such, Sheridan would not be liable under Title VII because it fired the appellee for breaking the rules, not for protected expression. The trier of fact here chose to go the other way, but the this choice too was supported by the weight of the evidence. The jurors were entitled to believe Pickett's testimony. Once they did so, they had to come up with

an explanation for the remark "why don't you go clean some stores," as well as the generally tense atmosphere of June 27, 2006, meeting, at which Zeller himself testified to hearing Paynter suggest that appellee was attracting the unwelcome advances because she was pretty. Such behavior, coupled with remarks that nothing was going to change at Sheridan because the facility was the culprits' home, could certainly be read by a reasonable jury to mean that the Center's management found Pickett's complaints to be annoying and wanted them to stop. Appellee's testimony that she could never find staff to escort her into the rooms of problem residents bolsters this conclusion by depicting Sheridan as an employer increasingly reluctant to combat harassment. Finally, the continued presence of the resident responsible for the June 24 incident despite Paynter's promise to remove him makes more sense in light of Pickett's narrative, where Sheridan management became increasingly recalcitrant about looking for ways to protect Pickett from future harassment.

A finding that appellant was fed up with Pickett for impermissible reasons (frustration with the steady stream of Pickett's protected requests to curtail what she believed to be sexual harassment) and was waiting for an excuse to get rid of her would also explain the peculiar developments on Tuesday, June 28, 2006. That morning, plaintiff-appellee quickly went from being ready to work (she asked Zeller to help her retrieve a vacuum cleaner) to tearfully pleading to hold on to her job (Zeller confirmed this much), all *before* walking out of the Center. The fact that Pickett was already under the

impression that she lost her job prior to the occurrence of the event that appellant seeks to portray as the trigger for her termination could permissibly lead to the inference that Sheridan's version of the events was not true. Finally, Zeller's decision to confer with Paynter about the consequences of Pickett's actions prior to telling appellee that "it is best she part ways" with the company could arouse suspicion in the mind of a reasonable juror about whether the sudden departure of an otherwise well-performing employee would lead to automatic termination. If it wouldn't in other situations, one could conclude that here, appellant's management acted intentionally to strip Pickett of her job.

Together, the above pieces of testimony and accompanying inferences adequately substantiate the conclusion that Sheridan actually fired appellee in retaliation for protected conduct. The evidence here may not be overwhelming, but neither is it porous enough for us to overturn a jury verdict and a subsequent denial of a motion for a new trial. The trier of fact may infer bad intent even from ambiguous statements. Moreover, since Title VII cases often turn on conflicting testimony, we have consistently held that "circumstantial evidence that is relevant and probative on any of the elements of a direct case of retaliation may be admitted and, if proven to the satisfaction of the trier of fact, support a case of retaliation." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006) (citing *Sylvester v. SOS Children's Vills. of Illinois*, 453 F.3d 900, 902 (7th Cir. 2006)). As we have explained, "[e]mployment discrimination cases in particular often involve 'sensitive and difficult' issues of

fact. Plaintiffs often have great difficulty in gathering information and can present only circumstantial evidence of discriminatory motives. The credibility of witnesses is often crucial*." Christie v. Foremost Ins. Co.*, 785 F.2d 584, 586 (7th Cir. 1986). Given these considerations, the case presented by Pickett is enough to support the verdict.

Sheridan argues that appellee improperly characterized its stated reasons for terminating the employment relationship as pretextual. Specifically, appellant cites an Eastern District of Texas case for the proposition that Title VII requires plaintiffs to establish that protected activity was a "but for" cause of the adverse employment action before they can recover for retaliatory firing. *See Beaumont v. Tex. Dep't Of Criminal Justice*, 468 F. Supp. 2d 907, 922 (E.D. Tex. 2006). Sheridan also asserts that " 'a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason' as long as 'the reason is one that might motivate a reasonable employer.' " *Birks v. Jack Ingram Motors, Inc.*, 346 F. Supp. 2d 1216, 1224 (M.D. Ala. 2004). Both decisions are not binding on this court. Moreover, they do not require anything that Pickett did not prove. *See Speedy v. Rexnord Corp.*, 243 F.3d 397, 406 (7th Cir. 2001); *McNutt v. Board of Trustees*, 141 F.3d 706, 707-08 (7th Cir. 1998) ("In order to prove a Title VII violation (and thereby recover any relief) based on retaliation, *Price Waterhouse* still requires plaintiffs to establish that the alleged discrimination was the 'but for' cause of a disputed employment action."); *cf.* 42 U.S.C. § 2000e-2(m); *Serwatka v. Rockwell Automation, Inc.*,

591 F.3d 957, 959, 962-63 (7th Cir. 2010). As explained above, the testimony presented at trial allowed a reasonable jury to infer that appellee's complaints irritated Sheridan's management to the point that appellant sought to dismiss Pickett. Appellee had the right to establish this version of the events by presenting "a 'convincing mosaic' of circumstantial evidence . . . ." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Her testimony at trial satisfied the requirement of establishing a causal link between the protected conduct and the adverse action that our precedent demands. *See Gates*, 513 F.3d at 686; *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008); *cf. Hennessy v. Penril Datacomm Networks*, 69 F.3d 1344, 1351 (7th Cir. 1995) ("Penril asserts Hennessy was required to prove 'but for' causation as a prerequisite to obtaining back pay pursuant to 42 U.S.C. § 2000e-5(g)(2)(A). This assertion is mistaken. The 1991 Civil Rights Act amended Title VII to include an affirmative, but for, defense for the employer. If an employer proves that the same employment decision would have been made absent an illegal motivation, a plaintiff's remedies are limited. 42 U.S.C. § 2000e-5(g)(2)(B). In short, the 1991 Act provides that to avoid back pay and reinstatement, the employer, not the employee, must demonstrate that the employment decision would have occurred absent the impermissible motivating factor."). The jury found Pickett's proof persuasive and the record is not so sparse that we must second-guess its decision here. Like the district court, we see no reason why Sheridan's version of the events had to trump Pickett's as a matter of law. *See Paz v. Wauconda Healthcare & Rehab.*

*Centre, LLC*, 464 F.3d 659, 665-66 (7th Cir. 2006) (reversing grant of summary judgment in favor of an employer who claimed that she fired plaintiff for a variety of substantive transgressions when other evidence pointed at a distaste for Mexican workers and pregnant women as the driving factor); *Emmel*, 95 F.3d at 633 ("Second, just because [an employer] articulated a nondiscriminatory reason [for denying a promotion to a woman], the jury did not have to believe it.").

Sheridan attempts to justify its position that Pickett could not have proven that she was fired in retaliation for her complaints by pointing to statements like "an employee's complaint of harassment does not immunize h[im] from being subsequently disciplined or terminated for workplace behavior." *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 376 (7th Cir. 2007). *Bernier*, however, affirmed summary judgment for the defendant where plaintiff communicated his concern about potential sexual harassment by a gay co-worker by sending said gay co-worker the following anonymous instant message (IM): "Stop staring! The guys on the floor don't like it." We did not consider this to be protected communication within the meaning of Title VII because anonymous IMs were not the method of reporting sexual harassment Morningstar prescribed. By contrast, when the receiving co-worker contacted both his immediate supervisor and the HR department to report that he took the message itself to be sexual harassment, he followed the prescribed procedures to the tee. Later, Bernier (the plaintiff) lied about sending the IM, so we saw nothing wrong with Morningstar firing him. The line cited by appellants

must be read in context, where it described a complaint that was not itself protected expression. Sheridan does not claim, nor could it reasonably do so, that Pickett's communications were similarly deficient.

Similarly, *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003 (7th Cir. 2000), does not advance appellant's case. The relevant part of that decision affirmed summary judgment for defendant employer in a retaliatory firing case predicated entirely on suspicious timing. We reasoned: "Here, the protected expression, Ms. Paluck's sexual harassment complaint, occurred nearly a full year before her termination. That interval, standing alone, is too long for the timing of Ms. Paluck's firing to raise an inference of discrimination." *Id.* at 1010. After making this observation, we went on to note that our conclusion does not change merely because Gooding Rubber noted true disciplinary issues with Paluck at around the time she made her harassment complaint.

> In Heis' memoranda, he made two allegations about Ms. Paluck's behavior: that she had problems with attendance and tardiness, and that she spent too much time on personal phone calls. In Ms. Paluck's response to Heis' charges against her, she conceded that his first allegation was accurate, and she did not rebut his second allegation. In this court, she does not deny the truth of Heis' allegations. Ms. Paluck's filing of a discrimination complaint does not prevent her employer from issuing written charges against her when her conduct warranted disciplinary action. Because it is undisputed that

> Ms. Paluck's actions justified disciplinary measures, we do not think a discriminatory motive reasonably may be inferred from Heis' taking such measures. Thus, even if Mork did rely on Heis' memoranda to terminate Ms. Paluck, no reasonable finder of fact could conclude that his decision to do so created a situation in which retaliatory motive caused Ms. Paluck's dismissal.

*Id.* at 1011 (citations omitted).

*Paluck* shows that an inquiry into whether bad intent may be inferred for purposes of Title VII is inherently fact-dependent. Judge Pallmeyer carefully heeded such instructions in evaluating appellant's motion for a new trial. As explained above, we agree that unlike the plaintiff in *Paluck*, Pickett presented enough evidence to persuade a reasonable jury that her complaints caused Sheridan to fire her. That case differs from the present matter in at least one important way: appellee here vigorously disputed that she violated Sheridan's workplace rules prior to being dismissed, whereas Paluck readily conceded as much. While appellee acknowledged that it was "wrong" for her to walk out of the Center on June 28, 2006,[1] she presented a compelling case that she had

---

[1] Pickett did not elaborate on why she perceived her actions to be problematic, and defense counsel did not press her on the issue. Thus, we cannot determine whether appellee was concerned that she was violating the Sheridan employee handbook rules, acting overly emotional at work, or perhaps not

(continued...)

already been terminated by that point in time in her
meeting with Zeller. *Paluck* does not dictate a result of the
present litigation and the district court did not abuse
its discretion when it declined to disturb the jury verdict.

B.  Improper Statements of Counsel

Sheridan next argues that comments made by Pickett's
counsel were sufficiently prejudicial to warrant a new
trial. Appellant presented this point in its Rule 59(a)
motion to no avail, so we again review for abuse of dis-
cretion. *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 636
(7th Cir. 1996). Furthermore, we have repeatedly stated
that comments made by attorneys during closing argu-
ments rarely rise to the level of reversible error. *See, e.g.,*
*Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997); *Moylan*
*v. The Meadow Club*, 979 F.2d 1246, 1250-51 (7th Cir. 1992).

The allegedly problematic remarks here are actually
quite benign. For example, Sheridan argues that plaintiff's
counsel improperly appealed to the sympathy of the
jury by referencing the underlying sexual harassment
conduct that the district court previously held to be
inactionable. The actual references were brief and only
served to provide the jurors with a summary of the

---

[1] (...continued)
fighting harder to persuade Zeller to let her keep her job. A
person's actions can be "wrong" with respect to various base-
lines, and the record before us leaves room for speculation
about which was implicated most closely on June 28, 2006.

context in which appellant and appellee parted ways. The closing did not run afoul of Judge Pallmeyer's ruling on a motion in limine; moreover, appellant did not contemporaneously object to the statements, forfeiting (and possibly waiving) its current position. *See United States v. Olano*, 507 U.S. 725, 733 (1993)*; Gonzalez v. Volvo of America Corp.*, 752 F.2d 295, 298 (7th Cir. 1985 (per curiam) ("[D]efendant-appellant waited until the jury had returned an unfavorable verdict to complain to the trial court that plaintiffs' closing argument had been improper. Perhaps defendant-appellant feared that a contemporaneous objection would incur hostility from the jury. This court need not speculate as to the nature of defendant-appellant's motives. Suffice it to note, however, that risky gambling tactics such as this are usually binding on the gambler. This court has not hesitated in the past to bind a party to its strategic decision to sit silent in the face of claimed error by refusing relief when the party complains because the result is unfavorable.").

The same goes for the statement "you've got to send some message to this employer that they shouldn't do this kind of thing again." The language is not prejudicial; Title VII, a statute designed to prevent retaliatory firings, allows plaintiffs to recover damages precisely to deter employers from repeating infractions in the future. Thus, cases like *Adams Laboratories, Inc. v. Jacobs Engineering Co.*, 761 F.2d 1218, 1224-25 (7th Cir. 1985), which hold that counsel may not bring up a wealth or size disparity between the plaintiff and defendant where no part of the action implicates these issues, do not position this case

as an exception to the rule that counsel's comments during closing generally do not justify reversal of a compensatory damages award. Judge Pallmeyer instructed jurors that statements made by attorneys are not evidence and we, like she, presume that juries follow instructions. *Thomas v. Cook County Sheriff's Dep't*, No. 08-2232, 2009 U.S. App. LEXIS 29046 at *44 (7th Cir. May 3, 2010); *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007). We are therefore confident the district court did not abuse its discretion in denying the motion for a new trial on the basis of appellee's closing arguments.

C.  Compensatory Damages

Sheridan argues that Pickett was not entitled to damages because she lacked any medical evidence showing emotional distress and her claim that she ran out of money was premised only on her own testimony. We review an order refusing remittitur for abuse of discretion. *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003). We evaluate an award of compensatory damages by asking (1) whether the award is monstrously excessive; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *See EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995). Sheridan's position that Pickett could not have established emotional distress without corroborating evidence from a third party finds no support in our precedent. *See Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001) ("[A]n award

for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress."); *see also Deloughery v. City of Chicago*, 422 F.3d 611, 620 n.5 (7th Cir. 2005) (noting that a jury is entitled to conclude that plaintiff need not consult a mental health professional to establish emotional distress); *Merriweather v. Family Dollar Stores, Inc.*, 103 F.3d 576, 580-81 (7th Cir. 1996) (holding that plaintiff's testimony alone may support an award for emotional distress). Pickett testified that she was very upset by how Sheridan treated her, felt embarrassed talking to her children, and nearly became homeless as a result of her discharge. This evidence is enough to support a jury award of $15,000, which is well within the $200,000 cap set out in 42 U.S.C. § 1981a(b)(3)(C) and the benchmarks set out by other improper termination cases. *See, e.g.*, *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 704, 714 (7th Cir. 2004) (upholding compensatory awards of $50,000, $100,000, and $150,000 for retaliatory firings); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 484 (7th Cir. 2003) (upholding award of $75,000 where plaintiff found a new job within two months). The district court did not abuse its discretion in denying remittitur on the compensatory damages.

D. Punitive Damages

Sheridan concludes by arguing that "[t]his case comes nowhere near the class of employment discrimination cases in which punitive damages are appropriate" because the record contains no evidence of Sheridan's

malice or reckless indifference to federally protected rights. Instead, appellant claims it reasonably believed that it could terminate Pickett for walking out on her job, which would put it under the protective umbrella of *Kolstad v. American Dental Association*, 527 U.S. 526, 537 (1999) (finding punitive damages inappropriate where "the employer discriminates with the distinct belief that its discrimination is lawful"). We again review the district court's denial of remittitur for abuse of discretion. *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003).

The district court examined only whether the punitive damages award is consistent with what the evidence would permit a rational jury to find. *See Alexander v. City of Milwaukee*, 474 F.3d 437, 454 (7th Cir. 2007). It used the appropriate legal standard, searching for malice or reckless indifference. 42 U.S.C. § 1981a(b)(1). Courts have read this language to mean that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad*, 527 U.S. at 536. Judge Pallmeyer found that Sheridan crossed this line:

> [T]he jury's verdict for Pickett on her retaliation claim reflects that it did not believe Sheridan terminated Pickett for a legitimate reason. Moreover, the jury heard testimony that information on federal employment discrimination law was posted in Sheridan's building, and was directed to Sheridan's anti-retaliation policy. From this evidence, as well as the short time between notice to Sheridan of Pickett's EEOC charge and Sheridan's first offer of

reinstatement, it was not unreasonable for the jury to conclude that Sheridan knew it might be retaliating against Pickett in violation of federal law when it decided to terminate her.

This reasoning falls within the spectrum of discretion allotted to the district court. Pickett did seem to be presenting some problems for Sheridan, so it is unsurprising that the Center would want to part ways with appellee. Moreover, appellant's posting of the mandatory EEOC notice on its walls cannot alone act as sufficient foundation for an inference of bad intent. Holding otherwise would mean that every law-abiding employer would have the requisite mens rea for a punitive damages award.

On the other hand, appellant in this case was aware that Pickett's complaints were likely to be protected expression under Title VII because it attempted to curtail the underlying harassment. As we explained above, the jury could have reasonably concluded that these attempts were the sole cause of the friction between Sheridan and Pickett, and that Sheridan was waiting for an opportune moment to push Pickett out. *See, e.g.*, *Emmel*, 95 F.3d at 636 ("To prevail only requires that the plaintiff have proven that intentional unlawful discrimination was more likely than not the reason underlying the adverse employment decision in question."). This conclusion would explain why when Pickett started crying and pleading to keep her job on the morning of June 28, 2006 (prior to walking out of Sheridan), Zeller did not reassure her that she was still employed at the

Center. A district court does not abuse its discretion when it chooses one of two plausible theories.

Finally, appellant asks us to extend *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605 (2008), to mandate a one-to-one ratio between compensatory and punitive damages in this case. The logic of *Baker* does not apply to this Title VII case. Accordingly, we affirm the district court's denial of remittitur on the punitive damage award.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Sheridan's motions for a new trial and remittitur.